### JUNCTION OIL & GAS CO. et al. v. PRATT et al.

No. 13063—Opinion Filed April 15, 1924.

**1. Oil and Gas—Duty of Lessee to Drill Offset Wells—Damages for Failure.**

Where an oil company leases land from a party for the purpose of prospecting, drilling, and developing it for oil and gas purposes, it is the duty of such party to protect the leased premises by offset wells where wells have been drilled on the adjacent properties, so as to protect the leased premises from drainage from the wells on the adjacent property, and a failure to drill such offset wells renders the lessee liable in damages to the lessor.

**2. Same—Implied Obligation of Lessee.**

It is immaterial whether the lease provides that the lessee shall protect the lease by off-set wells against wells on the adjacent property, because there is an implied obligation to do that thing regardless of whether it is provided for in the lease or not.

**3. Same—Measure of Damages.**

The lessor has a right of action against the lessee for damages for a failure to properly protect the premises with offset wells, and under certain conditions the lessor has a right to sue for cancellation of the lease for such failure. In this case, it is held that the lessor had a right to maintain his action against the lessee for damages for failure to protect the premises by drilling offset wells. The measure of damages can be estimated by taking the amount of oil produced from the wells on the adjacent lands and apportioning it by allowing the lessor for a like amount of oil as the wells on the location adjoining the lessor's premises and base a right of recovery on such estimate.

(Syllabus by Maxey, C.)

Commissioners' Opinion, Division No. 1.

Error from District Court, Kay County; J. W. Bird, Judge.

Action by H. W. Pratt and Hattie Pratt against Junction Oil & Gas Company and E. E. Wilson, receiver of the Junction Oil & Gas Company. Judgment for plaintiffs, and defendants appeal. Affirmed.

This action was begun in the district court of Kay county by H. W. Pratt and Hattie Pratt, his wife, against the Junction Oil & Gas Company, a corporation, on June 18, 1919, for damages alleged to have been sustained by the plaintiffs during the two previous years on account of the failure of the Junction Oil & Gas Company to build a certain well offsetting producing oil wells on adjacent lands of plaintiffs in error. We will refer to the parties as they appeared in the trial court.

On December 13, 1910, the plaintiffs executed an oil and gas mining lease to the defendant Junction Oil & Gas Company, and afterwards the said lessee sold all of the gas rights in the whole tract, as well as its oil rights, under the east 80 acres of the land belonging to plaintiff, but retained the oil rights under the west 80 acres, which is in controversy herein. On September 8, 1916, the Kay & Kiowa Oil Company commenced the drilling of a well on what will be termed herein the Bradley lease within 300 feet of the lease of plaintiffs, which will hereafter be called the Pratt lease, at 300 feet from the south line of the Bradley lease and completed the well on April 26, 1917, and found a large quantity of oil at a depth of 3,275 feet, and in a 30 foot sand. This well is known as Bradley well No. 3 and produced $361,948.16 worth of oil up to June 15, 1919,

three days before this suit was filed. On October 26, 1916, the Duluth-Oklahoma Oil Company commenced drilling a well on what is known as the Harvel lease within 300 feet of the south line of the Pratt lease, which well was completed on July 10, 1917, at a depth of 3,318 feet which produced large quantities of oil. There were three wells drilled on the Harvel lease and oil run from the three wells together, and the three wells produced up to June 15, 1919, $377,084 worth of oil, and taking one-third of that, as the production of No. 3, which is the one nearest the plaintiff's lease, would be $125,694.66 produced from the well nearest the plaintiff's lease. On March 23, 1917, the Kent Oil Company completed a well on the Myers lease within 300 feet of the south line of the Bradley lease and 300 feet from the east line of the Harvel lease cornering with the Pratt lease. This well produced large quantities of oil at a depth of 3,314 feet, and is known as the Myers well. This well produced up to June 18, 1919, oil of the total value of $278,044. The Junction Oil Company, defendant, owner of the lease on the premises of plaintiff, commenced to drill an offset well on the Pratt lease in January, 1917, and drilled a hole in said Pratt lease to a depth of 2,700 feet, another hole to the depth of 2,595 feet, and another to about 1,900 feet, but none of said holes reached what is known as the 3,300 foot sand in which oil was found on the other three leases. The Junction Oil & Gas Company also drilled another hole near the first one on the Pratt lease, known as No. 6, to a depth of 3,240 feet. No oil was found in either of the four holes drilled on the Pratt lease, known as No. 3 and No. 6.

It is claimed by the plaintiffs that the defendant Junction Oil & Gas Company never drilled any well on the Pratt lease to the 3,300 foot sand; that the drillers were either negligent, indifferent, or unskillful; that they were having trouble all the time and spent most of the time fishing for tools lost in the well and had had to skid their rig twice at hole No. 3, and had the same luck of losing their tools in all of the holes they drilled, including hole No. 6, and claim that if the defendant had employed skillful drillers that there is no reason why they could not have drilled to the depth of the 3,300 foot sand and got a producing well. The defendant concedes that they had what they term bad luck in drilling on the Pratt lease, but that they had skillful men and men of experience, and that it was no fault of theirs that they failed to drill in the 3,300 foot sand, which is the oil producing sand on the Pratt lease, and concede that they never produced any oil from the Pratt lease. The parties both

waived a jury and tried the case to the court, and the court found for the plaintiffs and assessed the damages at $16,350, and after unsuccessful motion for a new trial appealed the case to this court.

They have assigned 14 errors, which will hereafter be disposed of.

G. A. Chappell, for plaintiffs in error.

Claude Duval, for defendants in error.

Opinion by MAXEY, C. Counsel for plaintiffs in error has not set out and argued his assignments of error separately and does not even set out his assignments of error in his brief except so far as they are contained in his motion for new trial. There is, however, an assignment of error attached to the record of the overruling of motion for a new trial, and this assignment, under the practice prevailing in this jurisdiction, is so broad as to cover the other assignments of error, and we shall discuss the points discussed in plaintiffs in error's brief, as near as we can understand them. As we understand the contention of plaintiffs in error it is that the evidence in this case was insufficient to sustain the findings and judgment of the court and may be subdivided into the four following heads:

"1. That they owed plaintiffs no duty to drill an offset well, because the wells on adjoining lands were not producing in paying quantities.

"2. That if they did owe that duty, they did their best to perform it.

"3. That plaintiffs pursued the wrong remedy—that they should have asked for cancellation of the lease, after this drainage, and suffered their damage in silence.

"4. That the amount recovered is excessive, and speculative."

The first and second are inconsistent. If the first be true, that is, that they owed plaintiff no duty to drill an offset well because the wells on adjoining lands were not producing in paying quantities, then why mention the second head that if they did owe that duty they did their best to perform it. Let us examine No. 1. The evidence of expert drillers is that the cost of drilling a well in that field was about $52,000. One of the wells on one of the adjoining leases was drilled for about $39,000, and one of them went over $50,000. So that we think to take the average cost of drilling a well in that field at $52,000 is a very fair estimate of the cost. The Bradley well produced up to the time this suit was brought $361,948.16 worth of oil. Deduct $52,000 from this amount as the cost of drilling the well and we have $309,948.16, the amount of the value of the

oil taken up to the bringing of this suit. The three wells drilled on the Harvel lease produced up to the time this suit was brought $377,084 worth of oil. $52,000 for each well, $156,000, deducted from this leaves $221,084 worth of oil. The well on the Bradley lease had produced up to the time of commencement of this suit $278,044 worth of oil. Deducting $52,000 from this leaves $226,044 worth of oil from this well. We cannot agree with the proposition that the wells on the adjoining land were not producing in paying quantities. As to proposition 2, the evidence shows that they made three attempts to drill a well at location No. 3 on the Pratt lease and never got either hole down to the 3,300 foot sand, and they had trouble with losing their tools, and other troubles incident to drilling a well in each of these holes, and were compelled to abandon them before they reached the oil sand. They then started to bore in location No. 6 on the Pratt lease and never succeeded in getting to the oil sand in that hole. They claim that they put in four years on these four holes on the Pratt lease, when the evidence shows that the average time of drilling the wells on the Bradley lease, Harvel lease, and Myers lease was about eight months, and according to defendants contention, spent four years on four different holes, none of which were drilled to the 3,300 foot sand. There is but one answer to this proposition, and that is, that the defendant did not employ competent workmen to drill, or try to drill, the wells on the Pratt lease. The evidence does not disclose that they had any trouble in drilling the wells on the three adjoining leases, which were all drilled about the same time and to about the same depth. So there is no merit in that contention. The other proposition is No. 3, that plaintiffs pursued the wrong remedy, that they should have asked for cancellation of the lease after this drainage instead of suing for damages. A sufficient answer to this proposition is that under the lease the defendants had two years from the date of the lease to commence drilling a well and one clause of the lease reads:

"That it is agreed that the lessee, his heirs or assigns, may at any time surrender up this lease and remove all of his property by delivering the same back to the lessor, his heirs or assigns, endorsed with the surrender thereon, signed by him or his assigns, and be thereby forever discharged and released from all monies due, or to become due, and from all obligations accruing, or to accrue."

Under this lease, it was the defendant or lessee who held the whip handle. He could have surrendered the lease under the above clause and saved himself all of the expense that he claims to have been made in trying to drill a well on the Pratt lease, but he did not want to surrender, he was satisfied that there was oil on this lease in paying quantities, and had a right to think there was from the oil that was being produced on the adjoining leases and he wanted the benefit of the oil, and but for his employment of unskillful, negligent, and careless employes in trying to drill a well on the lease in question, he no doubt would have found oil in as great quantities as the wells on the adjoining leases. He did not offer to abandon up to the time this suit was brought. The plaintiff was willing for him to drill on this lease and put no obstacle in his way of drilling which shows the fault was wholly with the defendants, that a well was not drilled to the 3,300 foot sand within the time that the other wells were drilled on the adjacent leases. There is nothing in the record to show that defendant has ever drilled a well to the 3,300 foot sand on this lease. The plaintiff did not want to cancel his lease, he wanted his land developed and oil produced so that he might get his royalty. He had his remedy to sue for damages for failure to drill these offset wells, as we will hereafter show. We have examined the cases cited by counsel for plaintiff in error and do not think they are applicable to the case under consideration. The case of Eastern Oil Company v. Beatty, 71 Oklahoma, 177 Pac. 104. The lease in that case is very different from the lease in this case and the production was very small and suit was begun during the drilling period in face of a stipulation to accept rentals for delay. So that the case is not at all like the case at bar. The case of Pelham Petroleum Company v. North, 78 Okla. 39, 188 Pac. 1069, is not in conflict with the case at bar, but rather tends to support contention of plaintiffs. In the case of Blackwell Oil Company v. Whitesides, 71 Okla. 41, 174 Pac. 573, it is said a court of equity has jurisdiction to decree a forfeiture of an oil and gas lease on account of the breach of an implied covenant to diligently operate and develop the property, when such forfeiture will effectuate justice, and the lessor is not limited to an action for damages because of such breach, where the measure thereof is uncertain, vague and indefinite. That clearly shows that he can pursue his action for damages and under certain conditions can sue for a forfeiture. On the question of the judgment of the court being excessive, we will say that we have examined the case of Daughtee v. Ohio Oil Co., 151 Ill. App. 102, and the same case as appealed to the Supreme Court of that state and reported in 105 N. E. 308, which is a

case very much like the case at bar, and the court in figuring out the damages in that case said:

"The foregoing evidence established a prima facie right of recovery, and it was not error to refuse to direct a verdict for the defendant. Upon the question as to the measure of damages, the court, in substance, instructed' the jury that in arriving at their verdict they should subtract from the quantity of oil which they found should have been produced from the premises during the period from November 10th, 1905 (the date of the assignment of the lease), to May 18, 1907 (the time of bringing the suit), the quantity actually produced and saved and allow the plaintiff one-eighth of the value of the difference at the market price during the period in question. This instruction correctly stated the rule as to the measure of damages."

So that in this case if we take the total production of the three wells adjoining the corner to the Pratt lease, $765,686.82, and assume that if a well had been in Pratt's corner during this period, the four wells would have produced the same quantity as the three did, which is as fair to plaintiff as it could ask, then the Pratt offset well, had it been drilled, would have produced one-fourth of $765,686.82, or the sum of $191,-421.70, and one-eighth royalty therefrom would have been $23,927.71 instead of $16,-350 allowed by the trial court.

The record in this case shows that the trial court tried this case with a great deal of care and patience. He was so desirous of deciding the case according to the rules of equity and justice, that he postponed the hearing for some days that the parties might get certain records from the State Auditor's office and from some oil companies in Tulsa. These records were procured and additional evidence introduced, and after a full examination of the record and the briefs of counsel for the respective parties, we are of the opinion that substantial justice has been done, and that the evidence amply supports the findings and the judgment of the court, and that it should be, in all things, affirmed.

By the Court: It is so ordered.