## TEXAS CO. v. RAMSOWER et al. *

(Motion No. 8011; No. 1048—4082.)

Commission of Appeals of Texas, Section A. Nov. 21, 1928.

For former opinion, see 7 S.W.(2d) 872. See, also, 255 S. W. 466.

H. S. Garrett, of Fort Worth, C. B. Ames, of Oklahoma City, Okl., and Charles L. Black, of Austin (Robert A. John and T. J. Lawhon, both of Houston, of counsel), for plaintiff in error.

Burkett, Orr & McCarty, of Eastland, for defendants in error.

NICKELS, J. 1. Amongst errors asserted in the motion for rehearing is the holding that evidence is present to support the verdict fixing damages at $7,525.87. The basic question is exhibited in varied aspect: (a) What evidence there is, it is said, has relation to the period intervening "coming in" of the Higginbotham well (November 29 or December 1, 1920) and payment of money rental on August 14, 1921; (b) the implied covenant was broken (if broken at all) only upon ex-

piration of a "reasonable time" after "coming in" of the Higginbotham well, it is said, and because there is lack of evidence to show what was a "reasonable time" there is one fatal omission; (c) since breach of the covenant does not occur, it is said, unless the required offset well or wells "could reasonably be expected to yield a profit over the cost of drilling, operation and marketing," and since there is no proof of the amount of such cost, there is another preclusive omission. Incidentally as well as independently, it is claimed that we erred in considering evidence of production for the entire period —December 1, 1920, to August 14, 1921. All of these phases were considered by us originally, but in deference to the vigor and assurance with which the argument is pressed, we venture a restatement.

The argument, it will be noted, is characterized by at least two assumptions: (a) Breach of the covenant does not occur in any case until lapse of a "reasonable time" after duty to use reasonable diligence becomes active. This, it may be observed, ignores the possible duty to begin drilling within a reasonable time, which duty, apparently, is of dignity and force equal to that of subsequent diligent prosecution of drilling to completion. Nevertheless, and for instant purposes only, we may assume the time of breach as that claimed. (b) Omission of drilling is justiciably innocuous in respect to either party unless expectation of profit to lessee (resultant of hypothetized drilling) be reasonably apparent. While some justifying expressions for the assertion are to be found in books, the thought apparently includes that non sequitur which inheres in a proposition that duty cannot arise or (having arisen) cannot be enforced or its breach redressed save when its performance promises net gain to the obligor. But in favor of the present lessee we assume its views to be sound. What the law is in respect to the questions involved in these assumptions ought not be determined until a case arises in which that action is required; what has been said was said for the double purpose of exhibiting the lessee's position and of preventinng misapprehension of the decision to be recommended.

In the evidence are to be found these hypotheses in respect to amounts of oil produced in the Higginbotham well: (a) Initial production (December 1, 1920) of "about" 1,300 barrels daily; production of 100 barrels per day "about" July 1, 1921; production was by natural "flow" until some time in July, 1921, and thereafter (at undisclosed rate) was by aid of pumps; production was "continuous," and it "declined from the time it started in to the first of July," 1921. (b) Production in December, 1920, averaged "about" 1,000 barrels per day; "about" January 1, 1921, it was "around" 600 barrels per day; thence, it "just gradually went down," and by July 1st had reached the 100-barrel per day mark—flowing "continuously" until some time in July when pumps were supplied. Upon these facts (in some particulars, estimated), the jurors (because weight of the testimony was for them) could infer: (c) Decline in production, for practical purposes, was constant and gradual from December 1, 1920, to July 1, 1921, or (d) decline in production was somewhat precipitous from December 1st to January 1st, and thereafter was "gradual" (from "about" 600 barrels to 100 barrels per day) to July 1st. When either inference is drawn, science supplies means of calculating production in each month subsequent to December 1st, in case of the first inference, or subsequent to January 1st in case of the second. And touching use of the second inference, the jurors had choice between testimony estimating December production at "about" 1,000 barrels per day and testimony estimating "initial" production at about 1,300 barrels per day and production at end of that month at "about" 600 barrels per day.

If decline in production was "gradual" from December 1st (first inference mentioned), production to July 1st amounted in volume to 164,244 barrels, and in value to $430,428. It amounted to 91,716 barrels ($176,581) in the period February 1st to July 1st, and 63,147 barrels ($105,158) in the period March 1st to July 1st.

If, as testified to, December production averaged 1,000 barrels per day and the decline after January 1st was "gradual" (second inference mentioned) from 600 barrels to 100 barrels per day, total production to July 1st amounted in volume to 100,235 barrels, and in value to $265,459.75. It amounted to 52,318 barrels ($97,750.25) in the period February 1st to July 1st, and to 37,891 barrels ($59,182.75) in the period March 1st to July 1st.

To the scale of values ("prices") shown in our original opinion, it should be added that the "price" was reduced on May 2, 1921, to $1.50 per barrel, and (inferably) it remained at that figure for the balance of the time involved.

It was shown by R. Reynolds that the average cost of seven wells drilled in the neighborhood was $30,000.

Three wells (Nos. 1, 3, and 4), it appears, were drilled to completion on the Higginbotham tract in 1920. All of this was done subsequent to June 15th, according to testimony of Gage. Drilling of No. 1 was completed some time (undisclosed date) prior to September 29th, for (according to Gage) it was "shot" into production on that date. No. 3 was completed "about a month later." The date when drilling of either well was actually commenced is not further shown. Mrs. Ramsower said that No. 4 "was drilled either the last days of November or the first of

December, 1920." O. Ramsower said that he "worked" on the Higginbotham tract "for two months while number 4 was drilling." This testimony was before the jury without objection, contradiction, qualification, or elaboration; and while its data is meager it is also general, and cannot be said to be wholly devoid of probative force in respect to a fact issue of what is a "reasonable time" for drilling a well. According to Gage, a well was actually drilled to completion within less than 3 months and 14 days; what time was actually consumed being left undisclosed. Since "while" may denote "a space of time" or "at the same time that," Ramsower's statement (unqualified as it was) might be taken as indicating "two months" as the period in which Higginbotham No. 4 was drilled, and Mrs. Ramsower's testimony is susceptible to construction which would narrow the time still more.

■ A good deal of arbitrariness would characterize any hard and fast rule announced for measurement of damages in such a case as this. We do not propose an effort at formulating a rule; we hold, merely, that in the testimony shown there is support for the verdict for $7,525.87, even if it be true that production of neighboring wells prior to elapse of a "reasonable time" ought not be considered, and even if it be true that probable cost of the well required (but not drilled) must first be deducted from the value of whatever production of neighboring wells is considerable. We call attention to a rule suggested by the Supreme Court of Oklahoma (in Junction Oil & Gas Co. v. Pratt, 99 Okl. 14, 225 P. 717, 719), in whose application all production is taken into account, and numerical proportion thereof is attributed to the required "offset." If that rule be applied in its full scope, its application will disclose a very large "reasonably expectant" profit to the lessee and a "royalty" interest in lessor of value many times the amount of the verdict. And if production during a "reasonable time" be excluded, and the rule still be applied on various states of fact shown in evidence, these alternative results may be found: (a) One-half of seven-eighths of the production after February 1st amounted to 40,126 barrels ($77,155), and (with deduction of $30,000 for cost of well) gave "reasonable expectation" of $47,155 profit to lessee and $11,036 as "royalty" to lessor. (b) One-half of seven-eighths of the production after March 1st amounted to 27,627 barrels ($46,007), and (with deduction of $30,000 for cost of well) gave "reasonable expectation" of $16,007 profit to lessee and $6,572 as "royalty" to lessor. (c) One-half of seven-eighths of the production after February 1st amounted to 22,890 barrels ($42,766), and (with deduction of $30,000 for cost of well) gave "reasonable expectation" of profit of $12,766 to lessee. On that basis the "royalty" interest

amounts to $6,109. (d) One-half of seven-eighths of the production after March 1st amounted to 16,577 barrels ($25,892). On this basis a loss of $4,108 to lessee would portend and the lessor's interest would be represented by $3,699. On strict application of that rule (with the limitations in favor of lessee shown above), it will be noted, there is a hypothesis of large gain to lessee and of damage to lessor greatly in excess of the amount of the verdict; there are two others of gain to lessee and of damage to lessor equal to about six-sevenths of the amount found by the jury; only the last of the four presented includes loss to the lessee or a wide variance between the "royalty" interest and the amount of the verdict.

2. We have re-examined all questions involved in the light of the motion for rehearing.

We adhere to the views formerly expressed, and recommend that the motion be overruled.