HILL CATTLE CORPORATION, RESPONDENT, *v.* KILLORN ET AL., APPELLANTS.

(No. 6,090.)

(Submitted April 25, 1927.   Decided May 25, 1927.)

[256 Pac. 497.]

*Contracts—Cancellation—Master and Servant—Contract Held One of Employment, not Partnership—Breach—Condonation —Ratification—Waiver—Estoppel—Written Contract—Rule of Interpretation — Parol Testimony — Inadmissibility — Directed Verdict—When Proper.*

Contracts—Master and Servant—Contract Held One of Employment and not One of Partnership.

. 1. A contract between plaintiff livestock corporation and defendants, reciting that it was one of employment of defendants as managers of plaintiff's ranches for the compensation therein enumerated, consisting of a sum of money equal to one-half the proceeds of the sale

of agricultural products, the increase in livestock, etc., after certain deductions, *held* one of employment and not of partnership.

Same—Cancellation—Breach of Contract by Employee—Directed Verdict.
2.    Evidence in an action for the cancellation of a contract of employment of managers of ranches of a livestock corporation the purpose of which contract was the raising of livestock and sale of the increase and not speculation, indulged in by defendants, *held* sufficient to warrant direction of a verdict in favor of plaintiff, for breach of contract, defendant's departure from its terms not having been justifiable by their claim that their employer profited by their operations.

Same—Ratification by Employer of Wrongful Acts of Employee—Condonation—What Does not Constitute.
3.    Where the vice-president of plaintiff corporation with knowledge of defendants' violation of their contract of employment as managers of its livestock business repeatedly urged them to comply with its terms to avoid its cancellation, without result, the claim that by failing to take action at once the objections to defendants' conduct were waived and their acts ratified has no merit, condonation of prior breaches of a contract being always with the implied condition of future good conduct in compliance with its terms, and retention of an employee after commission of a breach of his contract not preventing the master from using it as a ground for his discharge if the breach is repeated.

Same—Breach of Contract by Employee—Condonation—Waiver—Estoppel—Question of Fact—When of Law.
4.    Where condonation, waiver or estoppel is relied upon as a defense, the issue is one of fact to be determined by the jury, except where the evidence is of such a character as to warrant the court in assuming its sufficiency or insufficiency as a matter of law.

Same—Cancellation—Directed Verdict—When Proper.
5.    A directed verdict in favor of plaintiff in an action for cancellation of a contract of employment is proper where the evidence undisputably shows a substantial breach of its major terms, the fact that there was a conflict in the evidence as to minor matters not rendering the act of the court erroneous.

Same—Contract in Writing—Rule of Interpretation.
6.    In interpreting a written contract, the intention of the parties must be ascertained from the writing alone, if possible, and resort to extrinsic evidence in aid of interpretation may be had only when the contract appears on its face to be ambiguous or uncertain.

Same—Contract in Writing—Interpretation—When Parol Testimony Inadmissible.
7.    *Held,* under the above rule (par. 6) that the clear meaning of a provision of a contract of employment of defendants as managers of ranch property to the effect that their compensation for a year's services should be one-half of the total receipts from the sales of produce, the increase of livestock, etc., less certain deductions, in the light of other provisions, was that their one-half interest in the total receipts was chargeable with the total operating expenses in

3.,  See 18 R. C. L. 517.
4.   See 10 R. C. L. 845; 27 R. C. L. 912.
6.   See 10 R. C. L. 1021.

computing their compensation, and that therefore oral testimony as to prior or contemporaneous negotiations, merged in the contract, was properly excluded.

---

[1]   Agency, 2 **C. J.**, sec. 198, p. 556, n. 32 New.   Partnership, 30 **Cyc.**, p. 371, n. 11, p. 376, n. 25.

[2]   Agency, 2 **C. J.**, sec. 396, p. 732, n. 25; sec. 404, p. 739, n. 20; sec, 729, p. 959, n. 96.   Contracts, 13 **C. J.**, sec. 987, p. 781, n. 40 New.

[3]   Agency, 2 **C. J.**, sec. 110, p. 492, n. 35 New.   Estoppel, 21 **C. J.**, sec. 206, p. 1205, n. 33.   Master and Servant, 39 **C. J.**, sec. 89, p. 88, n. 62, p. 89, n. 63, 64, 65.

[4]   Master and Servant, 39 **C. J.**, sec. 127, p. 104, n. 96; sec. 129, p. 106, n. 8.

[5]   Cancellation of Instruments, 9 **C. J.**, sec. 199, p. 1258, n. 59 New.

[6, 7]   Agency, 2 **C. J.**, sec. 459, p. 795, n. 74.   Contracts, 13 **C. J.**, sec. 485, p. 524, n. 29, p. 525, n. 33.   Evidence, 22 **C. J.**, sec. 1459, p. 1098, n. 96; sec. 1468, p. 1110, n. 39.

*Appeal from District Court, Park County, in the Sixth Judicial District; J. J. Lynch, a Judge of the Second District, presiding.*

ACTION by the Hill Cattle Corporation against Peter Killorn and another.   Judgment for plaintiff, defendants' motion for a new trial was denied, and defendants appeal.   Affirmed.

*Mr. Frank Arnold* and *Messrs. Brown, Wiggenhorn & Davis,* for Appellants, submitted an original and a reply brief; *Mr. R. G. Wiggenhorn* argued the cause orally.

*Messrs. O'Connor & Miller, Mr. Miles J. O'Connor, Messrs. Gibson & Smith,* and *Messrs. Kremer, Sanders & Kremer,* for Respondent, submitted a brief; *Mr. J. Bruce Kremer* argued the cause orally.

MR. JUSTICE MATTHEWS delivered the opinion of the court.

Appeal from a judgment in favor of plaintiff.   The Hill Cattle Corporation, being the owner of ranches in Park county consisting of 12,638 acres, and holding approximately 4,000 additional acres under lease, and owning all necessary machinery, tools, etc., for their operation, the total value of the

real and personal property being upwards of $400,000, by contract dated June 1, 1924, and executed June 30, employed the defendants Peter Killorn and William Killorn to manage the property as farming lands and stock ranches, to be stocked by plaintiff. The defendants operated under the contract for a period of seven months, when the plaintiff declared the contract rescinded and dispossessed the defendants, on alleged breaches of the conditions and agreements in the contract contained. It thereafter brought an action against the defendants for an accounting and to have the contract declared terminated in accordance with the notice of termination served upon the defendants. The complaint alleged many particulars in which the plaintiff claimed the defendants had violated the terms of the contract.

By answer the defendants denied the allegations of wrongdoing, and set out their interpretation of the contract, and, by cross-complaint, alleged that the plaintiff had wrongfully terminated the contract to their detriment in sums aggregating $200,-000. Issue being joined by reply, the cause came on for trial before the court sitting with a jury, and, at the close of all the evidence, on motion of plaintiff, the court directed the jury to return a verdict in favor of the plaintiff on defendants' action for damages, and thereafter made findings in favor of plaintiff in its equitable action, and on the verdict and findings entered judgment in favor of the plaintiff. Thereafter defendants moved for a new trial, which motion was denied, whereupon defendants appealed from the judgment. They have made numerous assignments of error which jointly raise but the questions hereinafter discussed.

1. The first and principal question presented is as to the [1]    nature of the contract between the parties; the difficulties between the plaintiff and the defendants, and the differences between counsel for the defendants on the one hand, and opposing counsel and the court on the other, all arose from their divergent views on this question. The solution of the question is all-important in determining whether the court was

justified in directing the verdict as to the action at law set out in defendants' cross-complaint.

While the contract runs to the Killorn Bros., the record discloses that Peter was in fact the manager, and that William merely assisted in conducting certain agricultural operations under the direction of Peter; as he phrased it, "Pete was the boss." On being placed in possession of the real and personal property, with a checking account to be used for expenses and authority to draw upon the corporation for cattle purchased to the extent of $42,000, Peter Killorn immediately assumed the attitude of a lessee of the property on a profit-sharing basis and a speculator in livestock with unlimited financial backing. During the succeeding seven months he traveled over portions of Montana, Utah and Idaho, buying and selling cattle, many of which never reached the ranches, and while he always had in mind the ultimate building up of a good breeding herd of cattle on the ranches, this purpose seems to have been secondary to that of trading in livestock for profit, as he would, at any time, sell any part or all of a bunch of cattle purchased if he could do so at an advance over the purchase price, going so far as to permit the picking of choice heifers from the cattle shipped to the ranch and purchasing hogs for a quick turn at a profit. During the period of his operations he employed at least double the amount of his authorized expenditures in the purchase of cattle, although at the time of his removal he had reduced his holdings below the $42,000. It is reasonably clear from the record that had he been permitted to continue operations under the contract, he would have continued trading in livestock rather than relying for returns upon the slow process of breeding and raising cattle.

Most of the money received on sales was forwarded to the head office in New York for deposit in the fund against which he was issuing drafts, but on certain transactions the receipts were deposited in his expense account at Livingston and used for the purchase of other stock, while in certain instances "trades" were made without the money being deposited in

any bank. A small amount of his expense account was used for his personal expenses in keeping his motherless family at Wilsall, and $500 thereof was paid on his antecedent personal obligations. Certain tracts of land, on which he did not deem it profitable to run stock, were leased to strangers and small amounts of hay and grain were sold, as were a spring-wagon and saddle-horse, while a heifer was traded for a pair of "chaps" and a pair of boots, and with expense money the managers purchased two new and one second-hand automobiles for their use on the ranches and in traveling in search of stock, which might be purchased either for stocking the ranch or for sale.

In so dealing with the property entrusted to their care the managers contended at all times that they were within their rights under the contract, and this attitude was maintained during the trial, and that position is here asserted by their counsel. Thus we find the first assertion of counsel in their brief is that "by the terms of the contract the defendants, not the plaintiff, were placed in command—they were to control operations and the policy and methods of conducting the business; they were not under orders or required to report." In support of this contention counsel interpret the contract to read that the corporation agrees to turn over the ranches fully stocked with livestock "without restriction" to be managed "without restriction," upon the promise and condition that "the stockman is to share in the profits he, by his management, makes"; contending that "there is thus created a business in which the manager is made a partner in the enterprise and of necessity, not merely the possession of all this property, real and personal, but the unrestricted and unhampered control of the business and direction of its affairs become essentially the right of the stockman to entitle him to enjoy the fruits of his contract; * * * there is not a suggestion or line in the contract which limits the authority of the manager or prescribes for him a limited line of action, other than that he shall conduct livestock and ranching operations." Again

it is said in the brief: "In carrying on these large operations, they would have been entirely within their rights to have sold calves, cows, and steers as the exigencies of business may have dictated, and deposited the money in the joint account, or kept it in their stockings for that matter, and used the same for new purchases or for expenses or for whatever the business may have required." Again counsel assert: "The defendants could with impunity sell every hoof of the original livestock with which the ranches were stocked, so long as they replaced them with a like quantity and kind."

On the other hand, the corporate officers asserted at all times that the defendants were merely hired to manage the livestock and agricultural operations for the plaintiff and under its direction and supervision, and were charged with the duty of reporting regularly concerning the operations, purchases and sales. The secretary-treasurer, through whom payments were made, repeatedly admonished the manager to remember the terms of the contract and, in purchasing cattle, to keep within the figure fixed for that purpose, and, when he drew for amounts in excess, instructed him to sell cattle sufficient to bring their holdings down to the required valuation. The manager was repeatedly reminded that the contract required him to report to the office all details of his transactions so that a complete record might be kept in the head office of the corporation; and the officers finally demanded that a count of all cattle on hand be made and reported to the head office, but this was not done. Much correspondence passed between the parties, wholly unsatisfactory to the secretary-treasurer, and the manager was unable to explain his transactions to the vice-president, who resided in Livingston, in such manner that he could satisfy the officials in New York.

The contract, commencing with the phrase, "This contract of employment," recites the ownership by the first party of the real and personal property, with meadows, hay and grain "necessary and useful in the conduct of a stock and agricultural ranch," and funds sufficient for the purchase of livestock

"of sufficient number to properly stock the said ranches"; the desire of the corporation to secure "a manager to conduct the said ranch business," and the willingness of the second parties to "enter the employ" of the corporation "on a profit-sharing basis." It is then agreed that for a period of five years the second parties will "faithfully and efficiently manage and conduct * * * the business hereinbefore recited, devote thereto their best efforts and all of their time, agreeing to faithfully and honestly account to the first party in all particulars";· "to preserve and protect" the property entrusted to them, and they are authorized to take possession of the property "as agents of the first party." The corporation agrees "to employ the second parties for said term, to pay therefor the compensation hereinafter enumerated, and to purchase and place upon the ranches sheep, or sheep and cattle, of a value not exceeding forty-two thousand dollars, * * * such purchase to be made in such quantities and at such times as in the judgment of the first party may be desirable and profitable."

The contract then recites that the compensation shall be a "sum of money" to be determined annually, on December 31, as follows: "(1) The party of the first part shall prepare at the end of each year a financial statement of the operations for that year. (2) The parties of the second part shall be paid * * * a sum of money equal to one-half the proceeds of the sale of all agricultural products and of the increase in livestock and the wool therefrom, after the deduction of the following amounts therefrom: (1) * * * operating expenses * * * ; (2) * * * one-third of the real estate taxes on all of the ranches except the Lower Hamilton ranch; (3) * * * one-half of all personal property taxes; * * * (4) * * * $3,000 in connection with the occupancy of the Lower Hamilton ranch; (5) * * * one-half of the interest computed at the rate of 7 per cent * * * on moneys invested * * * in livestock so placed upon the premises."

The contract then provides that, "as moneys are received from proceeds of sales, one-half of such amounts shall first be

applied against advances for maintenance and operating expenses and interest * * * on debit or credit balances * * * against the second parties," and, "in the event of breach of the parties of the second part of any condition or agreement herein agreed by them to be performed, the party of the first part may cancel this agreement." Provision is made for settlement on cancellation. It is then provided that "there shall be maintained at all times during the term of this agreement and surrendered * * * at the · termination thereof * * * livestock of an equal kind and number and of approximately the same quality and ages as those placed thereon."

On June 30, 1924, and immediately preceding the signing of the contract, the following letter was addressed, and delivered to Peter Killorn alone: "Referring to the contract between us dated June 1, 1924, you are hereby authorized to make purchase of sheep, or sheep and cattle, in such quantities and at such times as in your judgment may be desirable or profitable, not, however, exceeding the total of $42,000 specified in the contract. Yours very truly, Hill Cattle Corporation, by Walter J. Hill, President."

It is of little consequence whether this letter modified the contract by permitting the second parties to stock the ranch at the expense of the first party, or made Peter Killorn agent of the company for this purpose. Our opinion is that Walter Hill merely treated Peter Killorn as the sole "manager" in writing the letter, as he was treated throughout the life of the contract. The period of purchase was coextensive with Killorn's operations as manager and the transactions were inseparable; all must be taken into consideration in determining whether there was a breach of the contract. As we view the matter, Killorn's activities were, in effect, no different than had he received the ranches stocked with cattle and, on taking possession, had proceeded to sell such animals as he determined could be disposed of at a profit, and then to employ the moneys

obtained from the sales, as well as additional moneys belonging to the company, in livestock speculation.

It is clear from a reading of the entire contract that it is, [2] just as therein stated, a "contract of employment," and that the intention of the parties was, that operations of the corporation, acting through its agents and managers, should extend only to the raising of agricultural products and disposing thereof, and the raising of livestock from the initial stock placed upon the ranches by the corporation and the sale of the *increase* from such stock, and, in the event sheep were placed on the ranches, the sale of wool sheared. The defendants were not entitled to any portion of the hay, grain and produce raised or the increase of the livestock, but were to be paid a "sum of money" for their services, to be determined in the manner specified, in lieu of fixed wages for their services. The fact that they thus shared in profits from the operations did not constitute them partners with the corporation (*Beasley* v. *Berry,* 33 Mont. 477, 84 Pac. 791; *Flathead County State Bank* v. *Ingham,* 51 Mont. 438, 153 Pac. 1005), but only the employees of the corporation, with such power and authority as was vested in them by the contract and the nature of their employment. While, from the nature of the operations, it might become necessary from time to time to sell individual animals from the original herd, by reason of age or condition, and replace them with profitable stock, there is no justification in the contract for the contention that the defendants could rightfully dispose of all of the stock placed on the ranch, or any considerable part of it, so long as, at the time of accounting, they were in position to turn over a like number of like age and quality. The purpose of the corporation was not speculation, but the *raising* of livestock and the sale of the increase—an enterprise requiring time and patience, and the contract did not authorize the employees to risk their employer's money in speculation; nor was their departure from the terms of the contract justified by the fact, if it is a

fact, that their speculations resulted in profit to the corporation.

2. Defendants contend that they did not breach the contract by failure properly to report their operations to the corporation so long as they were prepared to report at the end of each year. It will be noted that the only reference to a financial statement at the end of the year applies to the corporation, not the employees, while the managers obligated themselves to "faithfully and honestly account to the first party in all particulars." Commenting on this phase of the case, defendant's counsel say of them: "They are the product of the wide open spaces and of a free-hearted and square-shooting people. These methods are a survival from the days when money was borrowed upon a man's mere word, not his note, and when a contract such as the one here under consideration was solemnized by a hand clasp. New York and its methods are not to be reconciled with the plains of Montana, nor can the one understand the other." Whether regrettable or otherwise, the old order of the west has passed away, and, if the old-timers see fit to enter into the modern contracts of employment, they must adapt themselves to modern methods of living up to the terms of their contract or suffer the penalty provided for in the contract.

While, in the minor matters of breaches testified to by plaintiff's witnesses, the defendants made specific denial and the questions raised were thus matters for the jury to determine on the evidence, so that the court would not be justified in directing a verdict (*Cain* v. *Gold Mountain Min. Co.*, 27 Mont. 529, 71 Pac. 1004; *Stewart* v. *Stone & Webster Eng. Corp.*, 44 Mont. 160, 119 Pac. 568; *Jepsen* v. *Gallatin Valley Ry. Co.*, 59 Mont. 125, 195 Pac. 550), there is no dispute as to the major breaches above considered in the light of the interpretation given to the contract by the trial court and above declared; and, as to the right of the corporation to cancel the contract for such breaches, the trial court came to the only reasonable conclusion which could be reached under the evidence; the question became one of law and the court

was justified in directing the verdict (*Nord* v. *Boston & Montana C. C. & S. M. Co.*, 30 Mont. 48, 75 Pac. 681; *Conway* v. *Monidah Trust*, 52 Mont. 244, 157 Pac. 178; *Old Kentucky Distillery* v. *Stromberg-Mullins Co.*, 54 Mont. 285, 169 Pac. 734; *Milwaukee Land Co.* v. *Ruesink*, 50 Mont. 489, 148 Pac. 396).

3. Defendants, however, contend that the plaintiff consented [3] to the manner in which they did business and ratified their actions, and that, therefore, the contract was interpreted by the acts of the parties, the objections waived, and the plaintiff estopped from questioning their acts.

While the vice-president lived in Livingston and had some knowledge of the manner in which the defendants were transacting the business, and while, in the main, knowledge came to the secretary-treasurer in New York that defendants were purchasing cattle in excess of the valuation fixed in the contract, through the presentation of drafts, and had knowledge of the sales made, through the receipt of payments made, this latter official was repeatedly calling Peter Killorn's attention to the fact that he was exceeding his rights under the contract; that the corporation did not approve of his "turns" and "trades"; and that he should, by sales, reduce the livestock holdings to conform to the provisions of the contract. These letters do not amount to a ratification of the acts of the defendants, but rather to an attempt to induce them to comply with the terms of the contract, to the end that the corporation should not be called upon to cancel the contract—a bearing with the defendants in the hope that they would get down to the business for which they were employed. On October 7, 1924, this official wrote Killorn, stating: "The entire spirit of the arrangement between the Hill Cattle Corporation and yourself * * * was for you to purchase these animals, feed and care for them, and dispose of the increase, in the meantime keeping the herd up to the proper standard. I therefore feel that you should avoid the plan of buying for 'turns,' as in the case of the sheep recently purchased. You are right up to now to the full amount of money you agreed to use and we cannot honor drafts in excess of this amount,

even though there is a promise of proceeds of a quick sale reaching here a day or so after the draft for original purchase; * * * such transactions are not contemplated by the agreement and I am sure you will not under any circumstances ask me to extend the $50,000 total even temporarily." The record shows that Killorn continued to buy cattle thereafter.

We do not understand the law to be that, under such circumstances, there is a ratification of the acts referred to, or that the payment of indebtedness incurred in violation of the terms of the contract waives the right to object thereto or works an estoppel.

In *Gray* v. *Sheppard,* 147 N. Y. 177, 41 N. E. 500, it is said: "The master may overlook breaches of duty in his servant, hoping for reformation; but, if he is disappointed and the servant continues his course of unfaithfulness, he may act, in view of his whole course of conduct, in determining whether the contract of employment should be terminated." To the same effect, see *Siselman* v. *Cohen,* 25 Misc. Rep. 529, 54 N. Y. Supp. 991; *Rosbach* v. *Sackett & Wilhelms Co.,* 134 App. Div. 130, 118 N. Y. Supp. 846; *Ginsberg* v. *Friedman* (Sup.), 125 N. Y. Supp. 473.

Condonation of prior breaches of a contract is always with the implied condition of future good conduct in compliance with the terms of the contract (*McIntyre* v. *Hockin,* 16 Ont. App. 498; *Hauerbach* v. *Calder,* 15 Utah, 371, 49 Pac. 649; *United Oil Co.* v. *Grey,* 47 Tex. Civ. App. 10, 102 S. W. 934), and the fact that an employee is retained after the commission of a breach of his contract of employment will not prevent the master from using it as a ground for discharge, if the offense is repeated (*Gordon* v. *Dickinson,* 100 W. Va. 490, 44 A. L. R. 526, 130 S. E. 650; 18 R. C. L. 517; *Spotswood Arms Corp.* v. *Este* (Va. 1926), 133 S. E. 571).

When condonation, waiver or estoppel is relied upon as a [4] defense, the issue is one of fact to be determined by the jury, except in those instances where the evidence is of such a character as to warrant the court in assuming its sufficiency

or insufficiency as a matter of law.   (*G. A. Kelly Plow Co.* v.
*London,* 59 Tex. Civ. App. 208, 125 S. W. 974; *Moynahan* v.
*Interstate Milling Co.,* 31 Wash. 417, 72 Pac. 81; Wood on
Master and Servant, sec. 123.)

In the case at bar the defendants did not rely upon the
plea of waiver or estoppel as a defense, but asserted the action
of the corporate officers as an agreement to, or sanction of, their
interpretation of the contract as giving them sole command
and control of the business, and conclusively demonstrated
that they had no intention of reforming their methods to con-
form to the plaintiff's interpretation of the contract.   Under
these circumstances the court was warranted in assuming the
insufficiency of the evidence as to waiver and estoppel as a
matter of law.

4. As in the above matters a substantial breach of the con-
[5]   tract, warranting its cancellation under its express terms,
was shown, it is immaterial that, as to minor matters, such
as consent to the use of corporate funds for personal expenses
and the sale of articles of little value, there was a conflict in
the evidence.   A jury could have arrived at no other conclu-
sion than that the defendants had breached their contract, no
matter what their findings on these lesser matters.

5. The foregoing fully disposes of that phase of the case
having to do with defendant's cross-complaint for damages on
account of the cancellation of the contract.   The court did not
err in directing a verdict on those issues.

6. With reference to plaintiff's action for an accounting,
[6, 7]   defendants' counsel contend that the contract in ques-
tion is ambiguous as to whether the items of expense enumer-
ated are to be deducted from the total receipts from operations
shown, or from the defendants' one-half thereof, and that,
therefore, the court erred in excluding oral testimony as to
what took place at the time the contract was executed and
prior thereto.

Under the statutes and decisions of this state, the intention
of the parties is to be ascertained from the writing alone, if
possible, and resort may be had to extrinsic evidence in aid of

interpretation only when the contract appears on its face to be ambiguous or uncertain. (Secs. 7530, 7535 and 7545, Rev. Codes 1921; *Ming* v. *Pratt*, 22 Mont. 262, 56 Pac. 279; *Brockway* v. *Blair*, 53 Mont. 531, 165 Pac. 455; *Helena Light & Ry. Co.* v. *Northern Pac. Ry. Co.*, 57 Mont. 93, 186 Pac. 702; *Spaulding* v. *Maillet*, 57 Mont. 318, 188 Pac. 377; *Berne* v. *Stevens*, 67 Mont. 254, 215 Pac. 803.) Thus, in *Ming* v. *Pratt*, above, it is said: "As aids to an understanding of a written contract, but not to alter its terms, the surroundings of the parties, the subject matter, and even prior and contemporaneous oral negotiations and promises illuminating the design and intent, may perhaps be proved; but resort to such evidence is proper only when necessary and is not permissible where the intention and understanding are explicitly declared upon the face of the writing itself."

Here the "writing itself" seems to be clear and explicit. The contract of employment contemplated the handling of a vast amount of valuable property from which there should be large returns, so that in all human probability the compensation awarded the employees would far exceed the wage usually paid for such services, while it would require a large amount of money to afford the plaintiff reasonable interest on its investment of approximately $450,000. The contract therefore provides that the "sum of money" to be paid the employees for a year's services shall be one-half of the total receipts from the sales of produce and the increase from livestock and wool sold, less certain deductions. If there is any uncertainty as to whether the clause concerning deductions refers to the total receipts or the one-half thereof, it is set at rest by the provisions as to taxes, interest and the like, which render chargeable to the employees only a portion thereof. On the face of the contract it is clear that the intention expressed is that the one-half interest in the total receipts from the ranches is chargeable with the total operating expense in computing the compensation of the employees. The court did not, therefore, err in excluding oral testimony as to

the prior or contemporaneous negotiations which were merged in the contract.

7. On the evidence concerning the accounting the court found that, during the seven months of their operations, the defendants employed $112,887.92 of plaintiff's capital, of which sum $81,813.45 was used for the purchase of livestock placed on the ranches, leaving a balance of $31,074.47, representing the proceeds; that the total charges against the one-half thereof were $18,824.60, leaving a deficit of $3,287.24, so that there was no compensation due the defendants at the time of their discharge, although they had received their living expenses during the period. The court then found that the defendants had expended the sum of $2,056.87 in satisfying their private obligations and in buying automobiles for themselves, and gave plaintiff a judgment for that amount.

The defendants do not attempt to show wherein the computation made by the court is erroneous, but devote their reply brief to an attempted showing that the computation of counsel for plaintiff in their brief, and which differs materially from that made by the court, is erroneous, and seek to show a net balance due defendants under their interpretation of the contract.

Owing to the fact that the defendants did not report all of their transactions to the plaintiff and that many of their reported transactions are vague and indefinite, and that they kept no accurate records themselves, we find difficulty in determining from the record the totals of the different items making up the account between the parties, but from our examination of the record we cannot say that the court erred in the computations made.

For the reasons stated, the judgment is affirmed.

*Affirmed.*

MR. CHIEF JUSTICE CALLAWAY and ASSOCIATE JUSTICES MYERS and STARK concur.

MR. JUSTICE GALEN, deeming himself disqualified, takes no part in this opinion.