**CHRISTOPHER et al. v. GRUEBY et al.**
No. 2391.

Circuit Court of Appeals, First Circuit.
April 11, 1930.

Frederick H. Tarr, Frank W. Campbell, A. F. Christiansen, and William H. Shea, all of Boston, Mass., (Sylvester M. Whalen and Henry Wise, both of Boston, Mass., on the brief), for appellants.

Charles S. Bolster, of Boston, Mass. (Foye M. Murphy, Edward A. Neiley, and Blodgett, Jones, Burnham & Bingham, all of Boston, Mass., on the brief), for appellees.

Before BINGHAM, ANDERSON, and WILSON, Circuit Judges.

BINGHAM, Circuit Judge.

This is an appeal from a decree of the District Court for Massachusetts granting the petition of the owners of the schooner Commonwealth, seeking to have their liability limited under sections 4283–4289 of the Revised Statutes (46 USCA §§ 175, 183–188), and alleging that the schooner was seaworthy, that the petitioners were without privity or knowledge of any fault, denying liability, and praying to be exonerated from all liability. While off the coast of Nova Scotia on a fishing trip, the schooner took fire on Friday, April 8, 1927, sank, and was a total loss. Twelve of the crew were drowned, and some of the others were injured.

The Commonwealth was a fishing schooner with auxiliary power. She was built in 1913 and was 103 feet long and 24 feet wide. Originally she was equipped with two 50 horse power gasoline twin-screw engines. In 1919 the two gasoline engines were removed and a crude oil full Diesel engine of 180 horse power was installed. A part of the equipment of this engine included a small one-cylinder gasoline engine, known as the Palmer engine, which was used to pump air into the bottles that supplied the air pressure to vaporize the crude oil and ignite the same in the chamber of the Diesel engine. Ordinarily it was used only in starting up the Diesel engine after it had been shut down for a time.

In 1924 an electric lighting plant was installed on the schooner, which was known as a two-kilowatt unimote generator. This lighting unit consisted of a reservoir holding about 2¼ gallons of gasoline, which formed the base; above that was the gasoline engine, and above that the generator; and connected with it were four storage batteries. The gasoline was pumped from the reservoir into the carburetor of the engine. The exhaust from this engine was carried through the side of the vessel. The schooner also was equipped with an electric bilge pump, which was operated through a rheostat from these batteries.

The Diesel engine, the Palmer engine, the electric lighting plant with its gasoline engine, generator, and batteries, and the electric bilge pump, were at the time of the fire installed in the engine room.

The engine room was about 18 feet long, 14 feet wide, and 7 or 8 feet high. It was located immediately in front of the cabin and at the rear of the hold where the fish were kept. The Diesel engine was installed lengthwise of the ship in the center of the engine room, and the bilge pump was on the port side. On the starboard side, and, about 2 feet distant from the Diesel engine, was a recess opening into the engine room. The dimensions of this recess were about 4 by 5 feet, and it was high enough for a man to stand in. At the right side of this recess, as one faced it, was located the Palmer engine. On the further side and about 2 feet distant from the Palmer engine and on a bracket 2 feet above the floor was located the unit of the electric lighting system consisting of the reservoir, the gasoline engine, and the generator. And on the left-hand side of the recess were located the four storage batteries. On the deck and over the front portion of the engine room was what is described as the gurry kit. In this, among other things, was located a drum holding 50 gallons of gasoline. A pipe three-eighths of an inch in diameter led from this drum down through the deck to the Palmer engine, at a point about 2 feet distant from the electric lighting plant's main unit. This pipe connected directly with the carburetor of the Palmer engine and supplied it with gasoline. In this pipe near where it entered the Palmer engine was a shut-off valve. In the pipe and above the shut-off valve was a cock, from which gasoline was drawn. And on deck, the petitioners' evidence tended to show there was located in this feed pipe, at a point near the drum, another shut-off valve. There was no

main pipe or branch pipe that supplied gasoline from the drum to the reservoir of the engine of the electric lighting plant. This reservoir had to be supplied with gasoline by pouring it from a heavy can holding 5 gallons (termed a safety can, the orifice of which was 2 inches in diameter) into an orifice in the reservoir which was an inch in diameter. This orifice was covered by a screw cap, which had to be removed when gasoline was supplied to the reservoir. Whether at the time in question a tunnel was furnished for use in pouring gasoline from the can into the reservoir, the evidence does not disclose. A 5-gallon can of gasoline was kept in the engine room. The top to this can, when in place, was held tight under pressure, and it was stated that it probably took 10 pounds of pressure to remove the top.

The lighting plant consisted of a small four-cylinder gasoline engine furnishing the power to operate the two-kilowatt unimote generator supplying electric current for charging the storage batteries. The generator had five carbon brushes and was located about 2 feet from the orifice of the reservoir containing the gasoline supply for the gasoline engine. In addition to the five brushes on the generator, there were also two brushes on the magneto. There was no hood or covering over the brushes on the generator. According to the testimony, under certain circumstances when the generator was running, sparks might result, especially if any part of the brushes had become worn from any cause. If in good condition and in proper adjustment, there should be no "sparks." If the gasoline became low in the reservoir, the engine would slow down and then pick up again, finally stopping altogether. Under these circumstances the engine had a tendency to back-fire. The four storage batteries connected with the lighting plant were located on a bracket at the left side of the recess. According to the evidence, these batteries, when charged, were of sufficient strength to run the lights without operating the generator, but they would have to be "charged once an hour or so," depending upon the number of lights used. The gasoline engine would run on the 2¼ gallons which the reservoir contained about four hours, thus requiring more or less frequent refilling of the reservoir in the manner above described. If from the filling of the reservoir from the so-called safety can gasoline fumes accumulated in the small recess in which the lighting plant was contained, and gasoline vapors came in contact with any sparks in the generator, or if the engine back-fired, an explosion would be inevitable.

The floor of the engine room was made of wood and through 14 years of use had become filled with oil. It was located about 3 feet below the floor of the cabin. The walls of the engine room were made of matched boards. The front partition of the engine room was 8 or 10 inches thick. It consisted of a double partition of boards filled with sawdust, and extended from the ceiling below the floor of the engine room into the hold of the vessel. It was built to keep the heat from melting the ice where the fish were packed in the hold. At the front of the engine room there was a door leading into the hold, which was ordinarily kept closed, and at the rear starboard side of the engine room there were steps leading up to a sliding door going into the cabin, the door leading into the cabin being in line with the two foot space between the Diesel engine and the line of the opening to the recess. Above the engine room was a ventilator with a cowl, which led down into the forward part of the engine room, and at the rear was a skylight or hatch with a sliding top. Crude oil was burned in the Diesel engine. The vessel had four tanks of crude oil. These tanks held 2,200 gallons. Two of the tanks were on deck, from which pipes led to the Diesel engine. The other two tanks were located in the engine room. One on the port side at the end next to the cabin, the other on the starboard side at the rear of the recess and between it and the cabin.

 As the only means disclosed for filling a safety can with gasoline when the ship was at sea was from the draw cock on the pipe leading from the 50-gallon drum to the Palmer engine in the recess of the engine room; as the storage batteries which operated the lights had to be recharged once an hour or so, which involved the running of the lighting engine and the consumption of gasoline in its reservoir; and as the reservoir only held gasoline enough to run the engine for about four hours, although the time required to charge the batteries is not given, it is evident that the engineer was required at frequent intervals to fill the can or fill the reservoir, and that, if gasoline was spilled upon the floor either in filling the can or in filling the reservoir, particularly if any of the engines were running, as they often undoubtedly were in making the long trips to the Banks and back, that a dangerous fire hazard was presented. These are the plain facts, all of which were found by the District Court or

are taken from the testimony of the petitioning owners' own witnesses, bearing upon the question of the seaworthiness of the vessel, so far as they concern the construction and equipment of the engine room and the work there carried on. This being so, we are in as good a situation to determine whether, in these respects, the ship was seaworthy, as was the District Court; and we are of the opinion that the District Court was clearly wrong in finding the ship seaworthy in these particulars.

The owners of the schooner, who equipped this engine room as above disclosed, or who frequently went upon her after she was so equipped, knew or were charged with knowledge that the reservoir of the electric light plant would be filled from the gasoline can, the only means provided; that the can would be filled from the draw cock, also the only means provided; that gasoline was likely to be spilled and its fumes escape through the engine room; and that a dangerous fire hazard existed there, when the vessel was at sea rolling and pitching in a storm, especially should the engine back-fire, or sparks be thrown off the uncovered brushes of the generator, or the engineer should be careless in handling the engines or otherwise. It did not require the knowledge of an expert to appreciate this. The average man who gave the situation any consideration would understand and appreciate it. The District Court apparently excused the owners on the ground that the lighting plant was similar to those installed on other fishing vessels. But there was no evidence that a lighting plant of similar make had ever been installed in an engine room of this character where the reservoir of the engine was not provided with a supply pipe for conducting gasoline to it. The two gasoline engines that were originally installed in the Commonwealth and taken out in 1919 were supplied with pipes for gasoline. The Palmer engine was so provided for; and so was the Diesel engine. And in the case of this lighting engine it was all the more necessary because of its tendency to back-fire and of the electric sparks which its generator created and gave off. It is true that the "owners' duty did not require them to provide a vessel of fireproof construction, or to adopt the latest appliances, or the best safety devices"; but it did require them to provide reasonably safe appliances and equipment that would render those appliances reasonably safe for the uses to which they were to be put in the place where installed and the condition there existing.

■ Having created and suffered this dangerous condition to exist in the engine room for some three years, what did the owners provide to put out a fire in case one originated in the engine room?

The Act of June 9, 1910, c. 268, § 6 (US CA title 46, c. 16, § 516), provides: That "every vessel propelled by machinery other than by steam, more than sixty-five feet in length, shall carry ready for immediate use the means of promptly and effectually extinguishing burning gasoline." This statute is applicable to the vessel here in question, for it was propelled by machinery other than steam and was more than 65 feet in length. The particular means it carried for extinguishing a gasoline fire, or any fire, were two Pyrene fire extinguishers. These were kept in the engine room; one hung on the wall on the port side and the other on the wall on the starboard side. No other Pyrene extinguishers were provided for use or kept anywhere else on the vessel. If it was reasonable to have two fire extinguishers in the engine room, was it reasonable in view of the fire hazard there existing to provide only two fire extinguishers and keep those in the engine room? We think but one answer reasonably can be made to this and that is, in view of the fire hazard there, that the schooner should have carried Pyrene fire extinguishers elsewhere, so that, if a fire broke out in the engine room, and the fire extinguishers there could not be used, others would be (in the language of the act) "ready for immediate use," for "promptly and effectually extinguishing burning gasoline."

The two Pyrene extinguishers were provided when the vessel was first put in service some 14 years before. At that time there were two gasoline engines installed in the engine room. At the time of the fire there were four engines on board, the crude oil engine and the two gasoline engines in the engine room, and another gasoline engine on deck, which furnished power for the hoisting pump. But no additional fire protection in the way of Pyrene extinguishers was provided, although the fire hazard on the vessel had been measurably increased, and particularly in the engine room, due to the increase in the number of engines there, and the dangerous means provided for supplying gasoline to the lighting engine.

■ Other means on board was a two-way pump operated by a hoisting engine located on the deck about 20 feet forward of the hatch to the engine room. To enable this pump to work, dry-cell batteries and a boost-

ing coil were required. The pump was used for hoisting and pumping water for the fish and for washing down the deck. It being a two-way pump, it could be used for pumping water into the vessel or pumping it out. It had a capacity of throwing 100 gallons of water a minute. It was provided with at least two sections of hose, of 20 feet each, and a nozzle. This pump could not be used to extinguish the fire because the batteries and boosting coil were kept in the engine room where the fire was. The excuse advanced for keeping the batteries, which were dry-cell batteries, in the engine room was to keep them dry; that they would get damp if left on deck in the gurry kit. These batteries were inexpensive affairs. Others reasonably could have been obtained and kept elsewhere, but no others were provided. The forecastle was a place where they could have been kept dry, if it was not feasible to provide means for keeping them dry in the gurry kit. There was a supply of buckets on board, but they were inadequate to extinguish the fire in the engine room. It is difficult to see how it can be said that "means of promptly and effectually extinguishing burning gasoline" were provided, "ready for immediate use." The District Court was of the opinion, although it expressed doubt in regard to the matter, that the failure to furnish an adequate supply of batteries and fire extinguishers was a fault that could not be attributed to the owners, not even to the owner, Capt. Watts, the master of the vessel. The reason it assigned, in the case of the batteries, was that they were paid for out of the proceeds derived from a sale of the fish prior to making distribution among the crew; but the owners cannot escape their duty to provide and equip a seaworthy vessel, or the duty imposed upon them by the statute and looking to that end, by requiring that the payment for necessary equipment shall be made in this way. The duty still remains where the law places it.

Was the fire caused by the negligence of the owners or any of them in failing to provide and equip a seaworthy vessel?

The duty of ship owners to their seamen to see that their ship is seaworthy and her equipment in safe condition for use when she starts on a voyage is a personal one, *responsibility for which they cannot escape by delegating its performance to another.* In this respect it is like the common-law duty of a master to provide his servant a suitable place in which to work. And a seaman injured through failure to perform this duty

is entitled to compensation. Globe S. S. Co. v. Moss (C. C. A.) 245 F. 54; The Osceola, 189 U. S. 158, 175, 23 S. Ct. 483, 47 L. Ed. 760; Thompson Towing, etc., Ass'n v. McGregor (C. C. A.) 207 F. 209, 211; The Iroquois, 194 U. S. 240, 24 S. Ct. 640, 48 L. Ed. 955; Cornell Steamboat Co. v. Fallon (C. C. A.) 179 F. 293; The Drumelton (D. C.) 158 F. 454; The Nyack (C. C. A.) 199 F. 383; Carlisle Packing Co. v. Sandanger, 259 U. S. 255, 42 S. Ct. 475, 66 L. Ed. 927; Pacific S. S. Co. v. Peterson, 278 U. S. 130, 134, 49 S. Ct. 75, 73 L. Ed. 220; The Colusa (C. C. A.) 248 F. 21.

It appears that the vessel's home port was the fish pier in Boston; that it left there on April 5, 1927, on a fishing trip to Brown's Bank off the coast of Nova Scotia; that there were 20 men on board, 17 fishermen, the captain, the engineer, and the cook; that the vessel arrived at Brown's Bank about 2 or 3 o'clock on Thursday morning, April 7, 1927; that they began fishing that day and caught about 35,000 pounds of fish, which the men dressed that evening and packed in the pens of the hold in ice; that the captain and five of the men slept in the cabin, as did the captain's dog, the others in the forecastle; that the captain turned in about 9 o'clock that evening and gave orders to one of the men, who was to be on watch the next morning at 3 o'clock, to have the engineer start the Diesel engine at that time, for the purpose of tacking the vessel up into the wind, as it was blowing hard and he was afraid of breaking the sail's rigging, if he undertook to make the tack with the sails; that the crew turned in about 9 o'clock or some later, except the two men on watch; that about 3 o'clock on the morning of April 8th, the engineer got up and shortly thereafter started up the engine and threw the vessel around; that about 4 o'clock the captain and boatswain, who were sleeping in the cabin, were awakened and saw the engineer rushing from the engine room into the cabin enveloped in sheets of flame; that all the members of the crew in the cabin were at once awakened and rushed up the stairway to the deck; that the captain's dog, that had been sleeping on the floor of the cabin, did not follow him or the men out, probably because he had been overcome by gas fumes; that the dog was later found dead on the floor of the cabin; that the outburst of fire was so sudden and the heat so intense that the men in the cabin sought escape up the stairway to the deck without their regular clothing; that before the men left the cabin the electric lights were burning; that imme-

diately after they reached the deck they were out; that the weather was freezing cold, the wind was blowing a gale and the ship was rolling and lurching; that some of the men without stockings on their feet went forward to the forecastle for clothing and to arouse the other men; that the captain went there for blankets to put over the hatch to the engine room thinking that he could smother the fire; that while there he saw the engineer and asked him what was the cause of the fire; that the engineer said it was "through a spark"; that "he said it was a spark from a wire—said something about a wire"; that the boatswain testified that the engineer told him that he was pouring gas into the generator at the time and that the engine back-fired; that the engineer's hands and face were burned, but whether his clothes were he did not know. The engineer was lost at sea. The managing owner, Grueby, in making his report to the government of the loss of the ship, stated the cause was "fire from gasoline."

It further appeared that the captain and the men, having failed to smother the fire with the blankets, undertook to put it out with the buckets by drawing water from over the side and pouring it though the hatch into the engine room; that they kept this up until about 5 o'clock, when, seeing that it was of no avail, they undertook to make holes through the deck into the engine room with the iron bars or handles of the two hand pumps that were on the deck, and, having made some holes, they turned the vessel so that the waves of the sea washed over the deck and through the holes and put out the fire; that when the fire was out they found the vessel had shipped so much water that she would sink unless it was pumped out; that they could not use the hoisting pump, for the batteries and the coil necessary to work the pump were in the engine room; that they undertook to pump out the water with the two hand pumps, but they sucked up gurry and dirt and had to be given up; that all the men left the ship in dories, some earlier than the others; that 12 were lost, the other eight being picked up by a fishing boat.

The District Court found that the fire was due to the negligence of the engineer and not from any defective condition of the machinery or equipment on board the vessel. But it does not follow that because the engineer may have been negligent that the owners are free from fault. We have above pointed out that the owners negligently created and/or suffered to exist a dangerous

situation in the engine room; that because of the apparatus which they provided the engineer could not supply gasoline to the engine of the lighting plant except by pouring it from the can into the small orifice of the reservoir; that in order to provide lights he might be called upon to do this at any time, stormy weather as well as calm; and the evidence above recounted discloses that on the night in question he was pouring gasoline, and that the ship was then encountering a strong north wind and a heavy sea. There can be no reasonable doubt that while the engineer was pouring gasoline it was spilled; and that the gasoline and its fumes became ignited. Watts saw the engineer enveloped in flame right by the opening to the recess. Whether the fire was started by a spark from a wire, or by a spark from the uncovered generator brushes, or from the back-fire of the engine, or from some other source, it can reasonably be found that the negligent situation, which the owners had created and/or suffered to exist in the engine room, and their failure to furnish adequate means "ready for immediate use" for "promptly and effectually extinguishing burning gasoline," one or both, were the cause of the loss of the ship, of the lives of 12 of the crew, and of the injury of three others.

If the engineer was careless in pouring gasoline when the engine or engines were running, nevertheless the owners could reasonably have foreseen that he might do so, and their negligence in suffering this fire hazard to exist in the engine room could be found to be the proximate cause of the disaster, and we think it was. Pittsfield Cottonwear Mfg. Co. v. Shoe Co., 72 N. H. 546, 548, 58 A. 242; Ela v. Cable Co., 71 N. H. 1, 51 A. 281; The Geo. H. Jones (C. C. A.) 27 F.(2d) 665, 668; 25 Harvard Law Rev. 111–113. No rules were provided or instructions given to the engineer not to fill the reservoir when the engines were running. Furthermore, as the owners were negligent in failing to provide reasonable means to cope with a fire in the engine room, where one reasonably could be expected to occur, their failure in this respect was plainly a cause of the loss and damage here complained of and for which they are responsible.

 It remains to be considered whether the negligent and dangerous situation in the engine room, and whether the negligent failure to provide adequate means for extinguishing fire, either or both, were created or allowed to continue, without the privity or

knowledge of all or any of the owners, so that some or all may be entitled to limit their liability to the value of the schooner and her freight.

The owners alleged in their petition that the schooner was seaworthy, properly equipped and supplied; and that any default was without their knowledge or privity. The burden of establishing this allegation was upon them. Eastern Steamship Corp. v. Great Lakes Dredge & D. Co. (C. C. A.) 256 F. 497, 504, and cases there cited; Quinlan v. Pew (C. C. A.) 56 F. 111, 118; In re Reichert Towing Line (C. C. A.) 251 F. 214; The Benjamin Noble (C. C. A.) 244 F. 95; The Southwark, 191 U. S. 1, 24 S. Ct. 1, 48 L. Ed. 65.

It appears that Capt. Watts, the master of the ship, owned an $^{18}/_{64}$ interest in the vessel; that George S. Grueby, the managing owner, owned $^{15}/_{64}$; that his brother, S. A. Grueby, owned $^{3}/_{64}$; that Capt. Enos S. Nickerson owned $^{8}/_{64}$; John Fulham $^{1}/_{64}$; R. Whall $^{2}/_{64}$; Mr. Parker $^{4}/_{64}$; Mrs. John Fulham $^{4}/_{64}$; Mrs. Annie C. Goodspeed $^{4}/_{64}$; Mrs. Schofield $^{1}/_{64}$; Mrs. Baum $^{1}/_{64}$; the estate of Alfred Anderson $^{1}/_{64}$; and the estate of Mr. Hunt $^{2}/_{64}$. Of these owners, all the men had places of business on the fish pier in Boston (the schooner's home port), except Capt. Nickerson and Capt. Watts. Nickerson was master of a fishing vessel sailing from the pier to the Banks. He was often at the pier at the same time as the Commonwealth, and saw her from time to time, but had not been on her for a good many years. Capt. Watts has been master of the Commonwealth since 1913 and constantly on her. The men doing business on the fish pier, who were owners, were at their places of business daily for a year at least prior to the fire, and often saw the Commonwealth. There was evidence that they were "familiar with the conditions" on the vessel. Grueby, the managing owner, so testified. He did business on the pier and was often upon her. If what he said was not true, the other owners doing business there could have been called as witnesses. None of them testified. Under these circumstances, we think it reasonably cannot be said that the negligent condition that had been permitted to exist in the engine room for some three years and the failure to provide adequate means for extinguishing fire, covering an equally long period, was without the privity or knowledge of Capt. Watts, Manager Grueby, and the owners having places of business on the fish pier; that they have not sustained the burden imposed

on them; and that the petition to limit liability must be denied as to Watts, Grueby, and the owners doing business on the fish pier, and allowed as to the other owners.

Although a commissioner was appointed before whom claims were to be presented, and fifteen claimants seasonably presented their claims, it does not appear that these claims have been passed upon. In view of this situation and the conclusion we have reached, the case must be sent back for further proceedings.

The decree of the District Court is affirmed as to Nickerson, Mrs. Fulham, Mrs. Goodspeed, Mrs. Schofield, Mrs. Baum, Frank R. Whall, the estate of Anderson, and the estate of Hunt, but is vacated as to the other petitioning owners, and the case is remanded to that court for further proceedings not inconsistent with this opinion, with costs to the claimants in this court, except as against the petitioning owners as to whom the decree of the District Court is affirmed. No costs in this court to those petitioners.