BROWN ET AL., RESPONDENTS, *v.* HOMESTAKE EXPLORA-TION CO. ET AL., APPELLANTS.

(No. 7,222.)

(Submitted September 24, 1934. Decided December 21, 1934.)

[39 Pac. (2d) 168.]

308

*Messrs. Cooper, Stephenson & Hoover, Mr. H. R. Ericke-meyer* and *Mr. John Hancock,* the latter of the Bar of Fort Worth, Texas, submitted an original and a supplemental brief; *Mr. W. H. Hoover* and *Mr. Hancock* argued the cause orally.

310

312

*Messrs. Hall & McCabe,* for Respondents, submitted an original and a reply brief; *Mr. E. J. McCabe* argued the cause orally.

314

MR. JUSTICE ANDERSON delivered the opinion of the court.

Plaintiffs brought this action for damages for the alleged breach of a written contract for the exploration and development of lands for oil and gas.

In the month of October, 1922, plaintiffs were the owners of three separate oil and gas prospecting permits recently issued by the United States of America on government land, pursuant to the Act of Congress of February 25, 1920 (sec. 14 [30 U. S. C. A., sec. 223]). One of these permits comprised 837.17 acres of land located in township 34 north, range 2 west. The lands described therein were in eight separate tracts, noncontiguous to each other, located as follows: Tract No. 1 in section 3; tract No. 2 in section 7; tract No. 3 in section 19; tract No. 4 in section 21; tract No. 5 in sections 21 and 28; tract No. 6 in section 30; tract No. 7 in section 33; and tract No. 8 in section 34. This permit is known in the record as the Flaherty permit.

Another of these permits embraced 964.18 acres, located in township 36 north, range 3 west. These lands were in six

separate noncontiguous tracts located as follows: Tract No. 1 in section 35; tract No. 2 in sections 17 and 20; tract No. 3 in section 18; tract No. 4 in section 9; tract No. 5 in section 3; and tract No. 6 in section 4. This permit is referred to in the record as the Andersch permit.

The third permit described land in township 35 north, range 2 west. It contained 240 acres consisting of two separate tracts of land not contiguous to each other, but located approximately one-half mile apart. This permit is known as the Pewters permit.

Prior to the commencement of negotiations resulting in the contract in question, plaintiffs had empowered three trustees, Messrs. Cowley, Flaherty and Fogarty, to negotiate and execute contracts relative to the exploration and development of the lands in these permits.

Soon after the issuance of these permits and a few days before the execution of the contract bearing date October 28, 1922, one or more of these trustees entered into negotiations with Julius C. Peters, president of the Homestake Exploration Corporation, which resulted in the execution of the contract here in controversy. Prior to its execution, an oil well referred to as the "Hogan gusher" had been drilled into production, offsetting the larger tract of land described in the Pewters permit. Plaintiffs were permitted to testify, over objection, that prior to the commencement of or during the negotiations with the president of the defendant corporation, a party to the contract, they received various offers from other oil companies for contracts for the exploration and development of the Pewters permit, which was then regarded as practically proven oil-bearing land by the completion of the Hogan well. They testified that a Canadian syndicate offered them a consideration of $68,000; they gave like testimony as to similar offers.

The contract named the defendant Homestake Exploration Corporation as party of the first part, and the plaintiffs as parties of the second part. Following preliminary recitals, the contract, as finally executed, provided in paragraph 1 that "the party of the first part agrees to undertake the development for

oil and/or gas, of all the land herein described, strictly in accordance with and to carry out and comply with all the terms and conditions of the said prospecting permits, issued by the United States government to the said parties of the second part for the prospecting of said lands for oil and/or gas. Said work to be carried on in a workmanlike manner, and in accordance with the best methods prevailing in the field in which said land is situated.''

The contract provided in paragraph 3 that, ''as soon as production is secured upon any of the lands described herein which would entitle the permittee thereof, that is to say the second parties, or any of them, to obtain a lease thereon, the parties of the second part, or any of them, to whom such permit may have been issued, agree that they will take such steps and proceedings as may be necessary with regard to the land embraced in such permit to obtain leases thereon from the United States government, in accordance with said Act of February 25, 1920. Which said lease or leases shall be held for the benefit of the parties to this agreement and in accordance with the terms hereof; and after the issuance of any such leases the party of the first part agrees that it will continue in a workmanlike manner and in accordance with the best practice prevailing in the field in which said land is situated, and in accordance with the terms of the lease under which the same is held, to develop, for oil and/or gas the tract embraced within the lease so issued.''

It was further provided in paragraph 10 that ''one of the inducements to the parties of the second part to the making of this agreement is that the lands embraced within the terms of this agreement shall be drilled into production as rapidly as possible and the party of the first part hereby binds itself to the exercise of reasonable diligence in the drilling of oil wells on such premises, to such number and extent as said premises will admit of.''

In addition to the foregoing quoted paragraphs it was provided that the drilling company would bear the expense of drilling the first well, and, if successful, it was to be re-

imbursed out of the first proceeds therefrom. Paragraph 4 provided for the payment of government royalties on the leases after the same were issued, and also for an overriding royalty of 2½ per cent. to the plaintiffs in certain instances, and, in other instances, 1½ per cent. These royalties so reserved, however, had all been sold by plaintiffs and conveyed prior to the commencement of this action.

Paragraph 5 provided that the net proceeds from all oil or gas produced and saved after the payment of royalties and the expenses of drilling operations should be divided equally between the parties. Paragraph 6 provided that all oil or gas wells drilled were to be drilled at the expense of the drilling company. Paragraph 7 defined the term, "expense of drilling." Paragraph 8 provided for the viewing of the premises and the rendering of statements. Paragraph 9 provided for the payment of any amounts due Stephen J. Cowley, as trustee for the plaintiffs. Paragraph 11 related to the division of royalties from the sale of water from water wells, if any. Paragraph 12 related to arbitration.

This contract was to continue in effect for twenty years, and so long thereafter as oil and/or gas was produced from the described lands in paying quantities.

So far as this controversy is concerned, the quoted paragraphs of the contract are the only portions of it here involved. The defendant Homestake Exploration Corporation, prior to the commencement of this action, assigned all its interest under the contract in and to the lands and premises unto its co-defendant.

It is conceded by all the parties to this action that the contract has been fully performed as to the lands described in the Pewters permit, on which numerous wells have been drilled and some of which produced oil, while others were dry holes. The proceeds from these wells have been insufficient to repay the cost of drilling on the various permits and the cost of operating the producing wells, although a substantial portion of the sums so expended has been repaid.

The permits, as originally issued, were for the period of two years, and, under subsequent Acts of Congress (30 U. S. C. A., secs. 221, 222), they were extended on applications made by various parties to this contract, so that they were in force and effect at the time of the commencement and the trial of this action.

In 1924, a dry hole was drilled on tract No. 1 of the Flaherty permit, and in 1926 another dry hole was drilled on the same tract. In 1925, a dry hole was drilled on tract No. 1 of the Andersch permit. No other drilling operations have been conducted upon the Flaherty and Andersch permits.

It is conceded by all that sufficient drilling has been done on these permits in order to validate them as required by their terms. In fact, it is conceded that the obligations of paragraphs 1 and 3 of the contract have been fully performed. The controversy is over the obligations of paragraph 10.

During the negotiations culminating in this contract, Peters, the president of the Homestake Exploration Corporation, presented to Mr. Cowley, one of the trustees for plaintiffs, a draft of a proposed contract which, according to the testimony, was adopted after paragraphs 10, 11, and 12 were added thereto. Paragraph 10 was admittedly inserted at the insistence of plaintiffs. The testimony is in conflict as to who was the draftsman of paragraph 10, plaintiffs' witnesses testifying that it was prepared by Mr. Peters and submitted to them. The testimony of the defendants is to the effect that it was prepared by plaintiffs, presumably by Mr. Cowley, who was an attorney.

The primary question involved on this appeal is whether paragraph 10 is a covenant for development only after the discovery of oil or gas, as is contended by the defendants, or is a covenant for exploration prior to the discovery of oil, as is contended by the plaintiffs. The plaintiffs brought this action to recover damages upon the theory that the paragraph was intended as a covenant for exploration, and that it has been breached, with resulting damages.

Plaintiffs in their complaint alleged the corporate existence of the defendants, the ownership of the permits by plaintiffs, the solicitation by the president of the defendant Homestake Exploration Company of an agreement for the exploration and development of the lands embraced in the permits. It is alleged that he represented to the plaintiffs that the corporation was an experienced oil and gas operating company, acquainted with the conditions prevailing in the field where the lands were located, and adequately equipped and financially able to undertake and complete the drilling of wells to the number and extent necessary to determine the existence or nonexistence of oil and gas in the lands, and that, if the agreement was made, the corporation would fully test, explore, and develop the lands for the production of oil and gas. It was further alleged that, relying on these representations, plaintiffs entered into this contract; that it was orally agreed before the contract was reduced to writing that all the lands embraced in the prospecting permits were to be fully explored, tested and drilled for the purpose of demonstrating the existence or nonexistence of oil and gas therein as rapidly as possible, in the exercise of reasonable diligence, and to the number and extent the lands would admit of; and that it was agreed to incorporate these provisions in the written agreement to be prepared by the corporation.

It was further alleged that after the contract was prepared, and prior to its execution, the attention of the plaintiffs was directed to paragraphs 1 and 10; and that it was there orally agreed and understood between the plaintiffs and the defendant, and so expressly stated and recited by the defendant, that the corporation understood and interpreted such paragraphs to mean and bind the corporation to drill as rapidly as possible, with reasonable diligence, a sufficient number of exploratory oil and gas wells upon all the described lands, in a number and to a depth sufficient fully to explore, test, and demonstrate the existence or nonexistence of gas or oil in such lands.

It was alleged that defendants have failed to perform the obligation of this agreement in accordance with the alleged

interpretation of the contract, to the damage of the plaintiffs in the aggregate sum of $570,000.

Other allegations appear in the complaint relating to the breach of other obligations of the agreement, with reference to failure properly to develop lands after discovery of oil, which, it is conceded, are eliminated from consideration by the instructions of the trial court. Copies of the permits, government leases and contract are attached to the complaint and made a part thereof by reference.

Defendants first moved to strike all the allegations of the complaint relative to oral negotiations, agreements and the alleged interpretation of the written contract. A general demurrer was likewise filed to the complaint. The motion and the demurrer were overruled. Answer was filed, wherein defendants denied the oral agreements, understanding and interpretation of the written agreement, and denied the breach of any obligation of the contract imposed upon them.

A trial was had to a jury, resulting in a verdict for $80,000 in favor of the plaintiffs. Judgment was entered in accordance with the verdict. A motion for new trial was made, heard, and denied. The appeal is from the judgment.

Numerous errors are assigned by the defendants, many of which are argued together in the briefs of respective counsel; so far as possible, we will treat the questions raised without reference to each individual specification of error.

Error is assigned upon the ruling of the trial court denying defendants' motion to strike. The motion was based upon the ground that the allegations under attack were sham, irrelevant and redundant. If the contention of defendants is correct that paragraph 10 was a covenant for development after the discovery of oil, with the Pewters permit eliminated from the case, then, clearly, the allegations were irrelevant. In order to dispose of the questions presented, it is necessary to determine: (a) Was the obligation of paragraph 10 only a covenant for development after discovery of oil, or a covenant for exploration? and (b), if the latter, is the paragraph ambiguous or uncertain?

Counsel for the defendants argue that paragraph 10 must, of necessity, be a covenant for development after the discovery of oil, because it provides that "the party of the first part hereby binds itself to the exercise of reasonable diligence in the drilling of oil wells on such premises to such number and extent as said premises will admit of." It is argued that an "oil well" means a well which produces oil, and that the drilling of a well seeking the discovery of oil is not an oil well; and hence the covenant is only operative after the discovery of oil.

The words of a contract are to be understood in their ordinary and popular sense, unless used in a technical sense. (Sec. 7535, Rev. Codes 1921; Solberg v. Sunburst Oil & Gas Co., 73 Mont. 94, 235 Pac. 761.) An "oil well" is defined as a "well or boring for petroleum." (Funk & Wagnalls Dictionary.) "A boring made for petroleum." (Century Dictionary.) The term "oil well" appears in Chapter 152 of the Laws of 1923, relating to liens for labor and materials furnished to owners of leaseholds for oil and gas purposes. It is there provided that any person who under a contract furnishes the owner of a leasehold any labor or material, machinery, or supplies, "used in the digging, drilling, torpedoing, completing, operating, or repairing of any oil or gas well" (sec. 1), is entitled to a lien upon the leasehold and the property used in connection therewith, as specifically enumerated in the statute. If the contention of counsel is sound, no lien could be asserted as against the leasehold or the properties used in connection therewith, unless and until oil was discovered in the well, for there would be no oil well until the discovery was made.

This court has heretofore held, in the case of Cheadle v. Bardwell, 95 Mont. 299, 26 Pac. (2d) 336, that such a lien as that above adverted to accrues in favor of the person furnishing labor or material and otherwise coming within the purview of this statute, even though the well in question was a dry hole, but drilled in prospecting for oil. Perhaps, technically, a well is not an oil well until the discovery of oil is

therein made; but, in common parlance, any well which is drilled for the purpose of discovering oil (petroleum) is an oil well, although no oil may be found therein.

Paragraph 3 was clearly a covenant for development after ██ the discovery of oil. It was there first provided that, as soon as production was secured, the parties agreed to take steps to obtain a lease in accordance with the Act of Congress of February 25, 1920. The leases, which were granted on lands in the Pewters permit under the Act, contain very definite covenants as to the development of the lands within the leases. They require the installation within three months, of a drilling outfit suitable for the drilling of oil wells, to be used continually thereafter for that purpose, until the leased lands were developed as therein provided, and they require the drilling of wells to take care of offset obligations as they arise, and the drilling of a specified number of wells on each 40-acre tract or lot. In addition to these obligations, it was agreed that, after the issuance of leases, "the party of the first part [defendant] agrees that it will continue in a workmanlike manner and in accordance with the best practice prevailing in the field in which the said land is situated, and in accordance with the terms of the lease under which the same is held, to develop for oil and/or gas the tract embraced within the lease so issued." Under the provisions of this paragraph the defendants undertook, after oil was discovered, to proceed to secure government leases in accordance with the Act of Congress, and to proceed to develop those lands in accordance with the leases and "in accordance with the best practice prevailing in the field."

Not only did the defendant corporation undertake to develop the land after the discovery of oil in accordance with the usual practice—the customary practice—or the practice of a reasonably prudent operator, but it undertook to develop the land in accordance with the best practice prevailing in the field. What further covenant for the development after the discovery of oil could be required or even suggested?

At the time the original draft of the contract was prepared, admittedly paragraph 3, containing this strict covenant for development after the discovery of oil, was then a part of the proposed agreement. The plaintiffs, however, insisted upon the inclusion of additional covenants. Paragraph 10 was inserted to supply them. This paragraph could not possibly lend strength to the obligations embraced in paragraph 3.

The whole of a contract is to be taken together so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other. (Sec. 7532, Rev. Codes 1921.) Unless we interpret paragraph 10 of the contract to be a covenant for exploration, and not a covenant for further development after the discovery of oil, we can ascribe no meaning to it whatever. When we consider that this paragraph was inserted in the contract at the request of the plaintiffs and after the contract already contained a strict covenant for further development, the conclusion is inescapable that the parties to the agreement must have intended that paragraph 10 was a covenant for exploration.

In fact, where contracts of this nature have involved at least two separate tracts of land incorporated in a single lease or contract, the one tract being highly developed and the other unexplored for some fourteen years, the court implied a covenant to develop the unexplored tract, and held the lessee or operator liable in damages for the breach of this implied contract. (*Alford* v. *Dennis*, 102 Kan. 403, 170 Pac. 1005, 1007.) The court there said: "Unless the plaintiff's tract was to be developed some time there was no reason to include it in the lease, and as it stands it is of no value to defendants." This decision is pronounced sound by Mr. Merrill in his work on Implied Covenants in Oil and Gas Leases, sec. 14, p. 40. Paragraph 10 contains covenants for exploration.

So, then, treating paragraph 10 as a covenant for exploration, is it otherwise ambiguous or uncertain? By its terms the operating company did agree to drill exploratory wells in addition to the drilling contemplated by the prospecting permits, but how many wells? The contract did not

specifically provide as to the number of these wells. It provides, with reference to the number of wells, "to such number and extent as said premises will admit of." Therein lies the ambiguity as to the number of wells. The quoted words are susceptible of various meanings.

In the case of *McDaniel* v. *Hager-Stevenson Oil Co.*, 75 Mont. 356, 243 Pac. 582, 584, this court said: "A contract may not be changed or revised under the guise of interpretation. Where a contract is plain and clear in its terms, neither interpretation nor construction is permissible. (*Ming* v. *Pratt*, 22 Mont. 262, 56 Pac. 279; *Spaulding* v. *Maillet*, 57 Mont. 318, 188 Pac. 377.) When the language employed by the parties 'is free from ambiguity or uncertainty, it is beyond the power of the court to enlarge or restrict its application or meaning.' (*Union Bank & Trust Co.* v. *Himmelbauer*, 56 Mont. 82, 181 Pac. 332.) And, when the terms of a contract are plain and unambiguous, resort may not be had to extrinsic circumstances under the pretense of ascertaining its meaning. (*Purdin* v. *Westwood R. & L. Co.*, 67 Mont. 553, 216 Pac. 326; *Berne* v. *Stevens*, 67 Mont. 254, 215 Pac. 803.)"

The contract in question does not come within the foregoing rule. Construction is necessary to determine its meaning as to the number of wells to be drilled.

The allegations sought to be stricken would require oral testimony in order to sustain them; and, if such oral testimony would be in violation of the parol evidence rule (sec. 10517, Rev. Codes 1921), the allegations should be stricken.

In *Sutton* v. *Masterson*, 86 Mont. 530, 284 Pac. 264, 266, it is written: "Under the statutes and decisions of this state, resort may be had to parol evidence in aid of the interpretation of a written contract, when it appears on its face that it is uncertain and ambiguous." (*New Home Sewing Machine Co.* v. *Songer*, 91 Mont. 127, 7 Pac. (2d) 238.)

Again, in the case of *Hill Cattle Corp.* v. *Killorn*, 79 Mont. 327, 256 Pac. 497, 502, it is said: "Resort may be had to extrinsic evidence in aid of interpretation only when the contract appears on its face to be ambiguous or uncertain. (Secs. 7530,

7535 and 7545, Rev. Codes 1921; *Ming* v. *Pratt*, 22 Mont. 262, 56 Pac. 279; *Brockway* v. *Blair*, 53 Mont. 531, 165 Pac. 455; *Helena Light & Ry. Co.* v. *Northern Pac. Ry. Co.*, 57 Mont. 93, 186 Pac. 702; *Spaulding* v. *Maillet*, 57 Mont. 318, 188 Pac. 377; *Berne* v. *Stevens*, 67 Mont. 254, 215 Pac. 803.) Thus, in *Ming* v. *Pratt*, above, it is said: 'As aids to an understanding of a written contract, but not to alter its terms, the surroundings of the parties, the subject-matter, and even prior and contemporaneous oral negotiations and promises illuminating the design and intent, may perhaps be proved; but resort to such evidence is proper only when necessary, and is not permissible where the intention and understanding are explictly declared upon the face of the writing itself.' "

In the case of *Musselshell Valley F. & L. Co.* v. *Cooley,* 86 Mont. 276, 283 Pac. 213, 217, where the question arose as to the propriety of receiving parol evidence to explain an alleged ambiguity in a deed, this court observed: "Over objection, Jacobs testified that in selling it it was his intention to convey all his right and interest in the ditch, except the right to have 25 inches of water conveyed to his land thereby. He said: 'There was no question but what the intention was to convey all my interest in the ditch, right-of-way and everything, ditches and dams and everything else.' \* \* \* If there was any ambiguity in the deed, under the circumstances shown, we have no doubt that the testimony of Messrs. Handel and Jacobs was admissible under sections 7527, 7538, and 10521, Revised Codes 1921, which provide that a contract may be explained by reference to the circumstances under which it was made and the matter to which it relates."

In the case of *New Home Sewing Machine Co.* v. *Songer,* supra, it was held that certain words in a written contract were ambiguous, and that all the negotiations, oral agreements, and understandings leading up to the execution of the written contract were admissible in order to explain the ambiguous language, under allegations alleging the ambiguity, and the representations, understandings and oral agreements. The complaint here, in paragraph 8, contains the allegation

that "in accordance with such agreed interpretation and understanding of the meaning of said paragraphs 1 and 10 of said agreement as applied to the respective terms and obligations of such agreement, and plaintiffs and defendant Homestake Exploration Corporation made and entered into said agreement on October 28, 1932."

Section 7540, Revised Codes 1921, provides: "If the terms of a promise are in any respect ambiguous or uncertain, it must be interpreted in the sense in which the promisor believed, at the time of making it, that the promisee understood it." This court has only considered the meaning of this section as applied to the determination of the location of the burden of proof on the trial of an action. (*Blankenship* v. *Decker*, 34 Mont. 292, 85 Pac. 1035.) The principle announced by this section was first recognized by the New York court, being adopted from the works of Dr. William Paley, as evidenced by the case of *Potter* v. *Ontario & L. Mut. Ins. Co.*, 5 Hill, 149, wherein it was said: "Let us apply Dr. Paley's rule in relation to the performance of contracts. He says: 'Where the terms of a promise admit of more senses than one, the promise is to be performed in that sense in which the promiser apprehended at the time the promisee received it.'" The New York court continued to recognize this rule of construction. (*White* v. *Hoyt*, 73 N. Y. 505; *Hoffman* v. *Aetna Fire Ins. Co.*, 32 N. Y. 405, 88 Am. Dec. 337.)

The English courts recognized the principle at a date subsequent to the early New York case, cited supra, in the case of *Mowatt* v. *Lord Londesbrough*, 3 E. & B. 307, 118 Eng. Rep. Reprint, 1156. As a result of these decisions of the New York court, in the preparation of the final draft of Field's New York Code, the principle announced in 5 Hill, as borrowed from Dr. Paley, supra, though in different language, was incorporated in that Code; and, although the section never became operative in New York, it was adopted in its identical language in Iowa. (*Inman Mfg. Co.* v. *Ameri-*

can Cereal Co., 133 Iowa, 71, 110 N. W. 287, 12 Ann. Cas. 387, 8 L. R. A. (n. s.) 1140.)

Section 11275, Iowa Code 1931, reads as follows: "When the terms of an agreement have been intended in a different sense by the parties to it, that sense is to prevail against either party in which he had reason to suppose the other understood it." In the case of *Thompson* v. *Locke*, 65 Iowa, 432, 21 N. W. 762, 763, the court said: "But it is always competent, in construing a contract, to show the situation of the parties, the subject-matter of the contract, and the acts of the parties under the contract, as showing what the parties understood to be their obligation; and this is no infringement of the rule that the contract cannot be explained or varied by parol"—citing the above section. (See, also, *Field* v. *Eastern Building & Loan Assn.*, 117 Iowa, 185, 90 N. W. 717.)

The state of Oklahoma has a section in language identical with our own. (Sec. 5052, C. S. Okl. 1921.) In the case of *Mitchell* v. *Vogele*, 125 Okl. 176, 256 Pac. 906, 907, the court said: "To be sure the rule is well settled that a written contract which is plain and unambiguous speaks for itself and it is for the court to construe the contract and advise the jury under proper instructions what the legal effect of the contract is and what the rights and liabilities of the parties thereto are; but, upon the other hand, the rule is just as well settled that where a contract is ambiguous and the court is unable to ascertain the intention of the parties from the face of the instrument itself, then extrinsic evidence is admissible to explain it and to give the court and jury the benefit of what was intended by the parties when the contract was entered into, so long as such evidence does not tend to vary or modify the written instrument itself"—citing the statute. (See, also, *Tyer* v. *Caldwell*, 114 Okl. 13, 242 Pac. 760.)

Section 4267 of the Georgia Civil Code of 1914 announces the same principle, but in somewhat different language. The construction of its provision by the Georgia courts is in ac-

cord with the decisions of the Iowa and Oklahoma courts. (*Hill* v. *John P. King Mfg. Co.*, 79 Ga. 105, 3 S. E. 445; *Caddick Milling Co.* v. *Moultrie Grocery Co.*, 22 Ga. App. 524, 96 S. E. 583.)

Professor Wigmore, in his work on Evidence (second edition) section 2466, submits an illustration taken from the works of Dr. Paley, which well illustrates the application of the principle of the statute in question, as follows: " 'Temures promised the garrison of Sebastia, that if they would surrender, *no blood should be shed.* The garrison surrendered; and Temures buried them all alive. Now Temures fulfilled the promise in one sense, and in the sense too in which he intended it at the time; but not in the sense in which the garrison of Sebastia actually received it, nor in the sense in which Temures himself knew that the garrison received it; which last sense, according to our rule, was the sense in which he was in conscience bound to have performed it.' "

The evidence in support of the above allegations, in the light of the foregoing authorities, being admissible, the motion to strike was properly denied.

Error is specified on the order of the court overruling ▮ defendants' demurrer. The argument in support of this contention is largely founded upon the ground asserted in support of the motion to strike. In addition it is urged that the plaintiffs did not allege any proper measure of damages. The demurrer, as finally submitted, was general.

Where a complaint does not set up a true measure of damages, it may be subject to a special demurrer on that ground; but, if it discloses a violation of the plaintiff's legal rights in some respect by the defendant, it is good as against a general demurrer, and evidence is properly admissible thereunder as to the true measure of damages. (*Davenport* v. *Western Union Tel. Co.*, 91 Mont. 570, 9 Pac. (2d) 172; *Rickards* v. *Aultman & Taylor Co.*, 64 Mont. 394, 210 Pac. 82.) The demurrer was properly overruled.

The defendants have assigned numerous errors relating to the admission of evidence, rulings on motions for nonsuit,

directed verdict, instructions given over objection, and offered instructions refused, wherein it is asserted that the court adopted an improper and erroneous measure of damages. The evidence offered as to damages was all presented upon the theory that the proper measure of damages was the amount equal to the reasonable money cost of drilling a reasonable number of exploratory test wells upon the lands. The court instructed the jury in accordance with this theory.·

It is the contention of defendants that the proper measure of damages for a breach of covenant is the reasonable value of that portion of the oil which would have accrued to the plaintiffs had the well been drilled, as provided by the contract, and operated.

Section 8667, Revised Codes 1921, provides generally the measure of damages for breach of contract; as follows: "For the breach of an obligation arising from contract, the measure of damages, except where otherwise expressly provided by this Code, is the amount which will compensate the party aggrieved for all the detriment proximately caused thereby, or which, in the ordinary course of things, would be likely to result therefrom."

Damages for the breach of a contract are said to be such as may fairly have been supposed to. have been within the contemplation of the parties when they entered into the contract, and such as might naturally be expected to result from its violation. (*Healy* v. *Ginoff*, 69 Mont. 116, 220 Pac. 539; *Hall* v. *Advance-Rumely Thresher Co.*, 65 Mont. 566, 212 Pac. 290; *Myers* v. *Bender*, 46 Mont. 497, 129 Pac. 330, Ann. Cas. 1916E, 245.) Damages, in order to be recoverable for a breach of contract, must be clearly ascertainable in both their nature and origin. (Sec. 8668, Rev. Codes 1921.)

As observed by Mr. Summers, in his work on Oil and Gas, at page 448, an action for damages is seldom used for the breach of an express or implied covenant to complete wells; for, where the drill or pay clause is used, the duty to drill is in the alternative, with the duty to pay an agreed rental for

delay. If action be there brought for breach, if the rental has been paid, there may be no recovery; if the rental has not been paid, the damage is limited to the amount of the agreed penalty for delay. (*Woodland Oil Co.* v. *Crawford*, 55 Ohio St. 161, 44 N. E. 1093, 34 L. R. A. 62.)

Where the unless drilling clause is used, there is no express covenant to drill or pay. In such event, the lease by its very terms has ceased to exist. (*Berthelote* v. *Loy Oil Co.*, 95 Mont. 434, 28 Pac. (2d) 187.)

The defendants have cited many cases announcing the rule for the measure of damages in accordance with their contention. Most of these cases, but not all, involve the breach of a covenant for the further development of the leased premises after the discovery of oil in one or more wells. If paragraph 10 of the lease is construed to be a covenant for further development, these decisions would be in point; but, having reached a different conclusion on that question, we are unable to apply them here. Many of them likewise involve the breach of a covenant against drainage, either alone or in conjunction with a covenant for further development. Among the cited cases which relate to one or more of these subjects, and which are without application here, and upon which they rely, are *Texas Pacific Coal & Oil Co.* v. *Barker*, 117 Tex. 418, 6 S. W. (2d) 1031, 60 A. L. R. 936, and *Freeport Sulphur Co.* v. *American Sulphur Royalty Co.*, 117 Tex. 439, 6 S. W. (2d) 1039, 60 A. L. R. 890.

Some courts, however, have held in accordance with the contention of defendants, and have applied the same measure of damages to a case of the breach of a covenant to drill a test well or exploratory well, as is applied to the case of the breach of a covenant for further development after discovery of oil. Among the decisions of this class is the case of *Guardian Trust Co.* v. *Brothers,* (Tex. Civ. App.) 59 S. W. (2d) 343. This was a decision by a divided court. Other Courts of Civil Appeal of Texas have adopted as the measure of damages the well-cost rule. (*Mitchell, Jones & May* v. *Dabney,* (Tex. Civ. App.) 294 S. W. 243, *Texas*

*Pacific Coal & Oil Co.* v. *Stuard,* (Tex. Civ. App.) 7 S. W. (2d) 878, and *Curry* v. *Texas Co.,* (Tex. Civ. App.) 18 S. W. (2d) 256.)

In the case of *Carson* v. *Willitts,* 65 Ontario L. Rep. 456, 16 British Rul. Cases, 641, where it was agreed to drill some three wells upon lands in close proximity to those of the plaintiff, and where the defendant bored one well and refused to bore the other two, the well-cost rule was condemned as applied to the facts of that case, and the measure of damages was said to be the value of the sporting or gambling chance that oil would be discovered if the wells had been completed in accordance with the contract.

The Oklahoma supreme court has adopted the well-cost rule as the measure of damages for the breach of a contract to drill test wells. It is noteworthy that the statutes of Oklahoma providing the measure of damages for breach of contract are identical with our sections 8667 and 8668. The case of *Ardizonne* v. *Archer,* 72 Okl. 70, 178 Pac. 263, 265, involved the breach of a contract to drill a specified test well. The argument was there made, as here, that the lessor or owner had suffered no detriment, because it was not shown that, if the well had been drilled, oil or gas would have been found. The Oklahoma court, in its opinion, said: "Can it be said that, inasmuch as the lessor has not drilled the well, he has suffered no detriment, and therefore he is only entitled to recover nominal damages? We do not think so. It might as well be argued that if A. contracts to build a house for B., and is paid for it and then fails to keep his agreement, B. can only recover nominal damages unless he, himself, has built the house A. was paid to build. In this case, the lessor granted to the lessee certain rights and privileges appertaining to his property, in consideration of which the lessee agreed, among other things, to drill the well in question. No one would question the right of B. to recover of A. the cost of building the house, and we see no reason why the plaintiffs in error may not properly be required to pay the lessor the cost of drilling the well. We are not impressed with the argument

that the lessor has suffered no detriment because it is not shown that, if the well had been drilled, oil or gas would have been discovered. The very purpose of drilling the test well was to ascertain whether oil or gas could be found. It does not lie with the plaintiffs in error, who engaged and were compensated for drilling the well, to say that their performance would not be beneficial to the lessor.'' This rule has been adhered to by the Oklahoma court in the following cases: *Eysenbach* v. *Cardinal Petroleum Co.*, 110 Okl. 12, 236 Pac. 10; *Okmulgee Producing & Refining Co.* v. *Baugh,* 111 Okl. 203, 239 Pac. 900; *Newman* v. *Roach,* 111 Okl. 269, 239 Pac. 640; *Cosden Oil & Gas Co.* v. *Moss,* 131 Okl. 49, 267 Pac. 855; *Lorraine Petroleum Co.* v. *Bartlett,* 138 Okl. 8, 280 Pac. 286; *Dixon* v. *Dalton,* 158 Okl. 178, 12 Pac. (2d) 1108, and approved by the federal courts in Oklahoma cases. (*All-American Oil & Gas Co.* v. *Connellee,* (C. C. A.) 3 Fed. (2d) 107; *Continental Oil Co.* v. *Fisher Oil Co.,* (C. C. A.) 55 Fed. (2d) 14.)

It is argued that, in all the cases where the well-cost rule has been adopted, an agreement was under consideration which required the drilling of a definite number of test wells. It is further argued that these cases are distinguishable in that in every instance the plaintiff was the owner of some interest which would accrue to him immediately upon the production of oil. In support of the latter feature it is said that, if the wells had been drilled and oil found, plaintiffs had no interest in the wells. But the discovery and production of oil, if found in sufficient quantities, would, under the terms of the contract, be applied in payment of the cost of drilling and operating the wells; and, when a profit was realized, plaintiffs were entitled to one-half of it. It cannot be said that the plaintiffs in this case had no interest in the wells, if proved producers. True, the interest was not as direct and immediate as a royalty interest would be, but it was nevertheless an interest contingent on the wells being sufficiently productive to retire the entire cost of the drilling program and of producing the oil.

In the case of *Hoffer Oil Corp.* v. *Carpenter,* (C. C. A.) 34 Fed. (2d) 589, where the plaintiff was the owner of leases and had assigned certain adjoining leases to the defendants upon an agreement that they would drill a well and furnish him with the well log, thereby affording certain geological information to him, it was decided that he was entitled to recover, upon breach of the contract to drill, the reasonable value of this information, which would amount to the contribution a person would make under the circumstances for the drilling of an oil well in order to gain this geological information. The plaintiff there had no direct interest, present, future or contingent, in the production of the well agreed to be drilled.

It is asserted that the recognized text-writers (Thornton, Summers, Morrison & De Soto and Merrill, on Implied Covenants), have all commended the rule for the measure of damages contended for by the defendants. True, they have pronounced it the proper measure of damages for the breach of a covenant for further development; but we find no criticism made of the Oklahoma well-cost rule as the measure of damages as applied to a breach of a covenant to explore. They have cited the *Ardizonne Case* in their texts on other propositions in the decision, but have refrained from commenting one way or the other upon the soundness of the rule as there applied, or as applied to the facts in this case.

The only text which discusses the well-cost rule is that of Mills & Willingham on Oil and Gas. The rule is there criticised as applied to situations where the plaintiff has no beneficial interest in the well or wells contracted to be drilled, and where a number of such persons have contracted with the operator for the drilling of a well either on adjoining acreage or that in close proximity to their own. The author points out that, if the Oklahoma rule were applied in this type of cases, it would result in any number of actions by individuals, each having a separate cause of action, for the recovery of the well-cost. As stated, however, the plaintiffs in this case have a direct interest in the wells to be drilled, and no persons, other

than plaintiffs, are entitled to assert the breach of the agreement.

As applied to the lands embraced in the permits under dis- ▮ cussion, on which no production has been found, to adopt the rule of the measure of damages contended for by defendants, would result in an entire inability on the part of plaintiffs to secure proof which would in any way tend to prove any compensatory damages.

The general rule is that, where the cause and existence of damages have been established with requisite certainty, recovery will not be denied because such damages are difficult of ascertainment. (*Hoffer Oil Corp.* v. *Carpenter*, supra; *Calkins* v. *Woolworth Co.*, (C. C. A.) 27 Fed. (2d) 314; *Crichfield* v. *Julia*, (C. C. A.) 147 Fed. 65; *Wakeman* v. *Wheeler & Wilson Mfg. Co.*, 101 N. Y. 205, 4 N. E. 264, 54 Am. Rep. 676; *Bredemeier* v. *Pacific Supply Co.*, 64 Or. 576, 131 Pac. 312; *Rule* v. *McGregor*, 117 Iowa, 419, 90 N. W. 811; *Westesen* v. *Olathe State Bank*, 75 Colo. 340, 225 Pac. 837; *Bluegrass Cordage Co.* v. *Luthy*, 98 Ky. 583, 33 S. W. 835; *Black* v. *Hogsett*, 145 Ark. 178, 224 S. W. 439; *Stern Co.* v. *Friedman*, 229 Mich. 623, 201 N. W. 961.)

A person who has violated his contract will not be permitted to reap the advantage from his own wrong by insisting upon proof which, by reason of his breach, cannot be furnished. (*Hoffer Oil Corp.* v. *Carpenter*, supra; *Shoemaker* v. *Acker*, 116 Cal. 239, 48 Pac. 62; *Northern Light Min. Co.* v. *Blue Goose Min. Co.*, 25 Cal. App. 282, 143 Pac. 540; *Eastman Kodak Co.* v. *Southern Photo Material Co.*, (C. C. A.) 295 Fed. 98. See, also, Williston on Contracts, sec. 1346.)

A party who has broken his contract will not be permitted to escape liability because of the lack of a perfect measure of damages caused by his breach. (*Hoffer Oil Corp.* v. *Carpenter*, supra; *Shoemaker* v. *Acker*, supra; *Pye* v. *Eagle Lumber Co.*, 66 Cal. App. 584, 227 Pac. 193; *Kennett* v. *Katz Construction Co.*, 273 Mo. 279, 202 S. W. 558.)

A reasonable basis for computation and the best evidence obtainable under the circumstances and which will enable the

338

jury to arrive at a reasonably close estimate of the loss is sufficient. (*Hoffer Oil Corp.* v. *Carpenter,* supra; *Eastman Kodak Co.* v. *Southern Photo Material Co.,* supra; *Kennett* v. *Katz Construction Co.,* supra; *Osterling* v. *Frick,* 284 Pa. 397, 131 Atl. 250; *Prejean* v. *Delaware-Louisiana Fur Trapping Co.,* (C. C. A.) 13 Fed. (2d) 71.)

Applying these recognized principles, the only feasible rule by which the damages sustained can be measured is the cost of drilling the well or wells agreed to be drilled. The amount of damages can be established with reasonable certainty. The cost of a well does not include the value of the machinery, equipment, and casing used in drilling it, which is removable from the premises in case operations result in a dry hole. To adopt any other rule is to permit the defendants to breach the contract to the damage of plaintiffs, but to escape all liability for lack of proof to conform to any other measure of damages. Accordingly we hold that the court did not commit error in adopting this measure of damages.

The trial court, over objections, permitted certain witnesses for the plaintiffs to testify to offers they had received with respect to drilling on the Pewters permit prior to the negotiations with defendant corporation. The witness Peters admitted that certain conversations were had with some of the trustees, wherein he was informed concerning these proposals. Section 10517, Revised Codes 1921, after prohibiting the reception of evidence of the terms of a written agreement other than the writing itself, with certain exceptions, declares that the provisions of the section do "not exclude other evidence of the circumstances under which the agreement was made." Clearly, an explanation of the circumstances, and a repetition of the conversation between the parties at the time of the making of the contract, fall within the contemplation of this section. (*National Cash Register Co.* v. *Wall,* 58 Mont. 60, 190 Pac. 135; see, also, *Sutherland* v. *Green,* 49 Mont. 379, 142 Pac. 636, Ann. Cas. 1916A, 561.) The admission of this testimony was not error.

Certain witnesses were permitted to testify, over objection, as to the period of time when offset wells to producing wells should be drilled, and as to the drainage resulting from the failure to so drill. The claim for damages resulting from the failure to drill offset wells was specifically abandoned by the plaintiffs, and the entire question was withdrawn from the consideration of the jury by appropriate instructions of the trial court. The evidence offered in support of this claim for damages was indeed meager, although allegations with relation to such damage appear in the complaint. It is urged that this evidence was prejudicial to the rights of the defendants.

It is a general rule that an error in admitting improper evidence may be cured by an instruction which directs the jury to disregard it. (*Kotsakis* v. *Williamson*, 72 Mont. 158, 231 Pac. 1104; *Sanborn* v. *Powers*, 58 Mont. 214, 190 Pac. 990.) It is presumed that, where incompetent and immaterial evidence has been admitted, and the trial court has instructed the jury to disregard it, the jury has followed the instruction. (*Newton* v. *City of Roundup*, 60 Mont. 24, 198 Pac. 441.) If it be conceded that, under the issues in this case, the offered testimony was irrelevant, nevertheless reversible error does not follow.

One of the trustees was permitted, over objection, to testify as to a conversation between himself and one of his cotrustees, wherein the latter related to the witness the contents of a conversation between the cotrustee and Mr. Peters, president of the Homestake Exploration Corporation. The cotrustee testified as to the conversation had by him with Mr. Peters, substantially to the same effect as testified to by the witness over objection. Both conversations related to the oral understanding with reference to the exploration of the lands included in the permits during the negotiations prior to the execution of the contract. The objection was based upon the ground that the testimony was hearsay. In the ordinary case it would have been good. The apparent purpose in offering the testimony, however, was to bring home to the witness his

knowledge of these oral understandings and agreements, so that he might testify as to his reliance thereon.

Professor Wigmore, in his work on Evidence (second edition), section 1789, has said: "Wherever an utterance is offered to evidence the state of mind which ensued in another person in consequence of the utterance, it is obvious that no assertive or testimonial use is sought to be made of it, and the utterance is therefore admissible, so far as the hearsay rule is concerned."

Under the issues, facts and circumstances of this case, the admission of this testimony was not error.

Error is assigned upon the action of the court in refusing to give certain of defendants' offered instructions relating to the measure of damages, and the interpretation of the contract in accord with the defendants' contentions. The trial court instructed the jury upon other theories, which we have already said were correct and contrary to those contained in the offered instructions. If the court had given these particular instructions, they would have conflicted with those already given. It has been often decided that the giving of conflicting instructions is reversible error; hence the court was not in error in refusing the offered instructions, the giving of which would only have resulted in the commission of reversible error. (*Wray* v. *Great Falls Paper Co.*, 72 Mont. 461, 234 Pac. 486.)

The court instructed the jury, by instruction No. 11A, as follows: "The contract provides that the Homestake Exploration Corporation 'hereby binds itself to the exercise of reasonable diligence to drill all oil wells on said premises to such an extent as said premises admit of.' By this is meant the Homestake Exploration Corporation obligated itself to drill the number of wells upon the property which a reasonably prudent operator would have drilled under all the facts and circumstances in this case, exercising reasonable diligence. If a reasonably prudent oil and gas operator, under all the circumstances, would have drilled more exploratory wells on the

permit acreage in question, then the obligation of the contract in that particular has not been fulfilled."

By instruction No. 12, the court advised the jury as follows: "By this contract the defendants were and are bound to the exercise of reasonable diligence in the drilling of oil wells on the premises described in the complaint, to such number and extent as said premises will admit of. The defendants were not bound to drill additional wells on the permit acreage merely to demonstrate the existence or nonexistence of oil or gas, nor to drill any additional wells where there was no reasonable expectation of securing oil or gas in paying quantities."

The court, by instruction No. 17, first informed the jury as to the obligation imposed by the government permit in relation to drilling wells under paragraph 1 of the contract, and, after correctly disposing of that question, told the jurors, with reference to paragraph 10, as follows: "By paragraph 10 of the contract the parties intended that when a producing portion of the acreage had been reasonably proven and established and outlined, this producing portion should be drilled into production as rapidly as possible, and that the operator should use reasonable diligence in the drilling of oil wells to a sufficient number and extent to produce the oil therefrom as rapidly as possible."

It will be noted that there is perhaps some inconsistency between instruction No. 11A and instruction No. 12, on the one hand, and the quoted portion of instruction No. 17, on the other. Instruction No. 17, however, was proposed by the defendants and given by the court over the objection of the plaintiffs. Also, it is suggested that the concluding portion of instruction No. 17 was at variance with the rulings of the trial court theretofore made in disposing of the motion to strike, the demurrer, and the submission of evidence.

Instructions numbered 11A and 12, we believe to be proper instructions under the views heretofore expressed; and, if there be a conflict between them and instruction No. 17, the defendants are in no position to complain, since No. 17 was

more favorable to them than they were entitled to. (*State* v. *Jones*, 32 Mont. 442, 80 Pac. 1095; *Woods* v. *Latta*, 35 Mont. 9, 88 Pac. 402; see, also, *Grorud* v. *Lossl*, 48 Mont. 274, 136 Pac. 1069.)

The judgment is affirmed.

ASSOCIATE JUSTICES MATTHEWS and STEWART concur.

MR. CHIEF JUSTICE CALLAWAY, dissenting: As I see it, this case was tried, not upon the contract, but upon plaintiffs' attempted interpretation of paragraph 10 thereof as pleaded in the complaint. The mooted paragraph reads: "One of the inducements to the parties of the second part to the making of this agreement is that the lands embraced within the terms of this agreement shall be drilled into production as rapidly as possible and the party of the first part hereby binds itself to the exercise of reasonable diligence in the drilling of oil wells on such premises, to such number and extent as said premises will admit of."

After much consideration, this provision was drafted and agreed upon by lawyers; it received the approval of Mr. Cowley, a lawyer, who acted for the plaintiffs.

"The whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other," in the language of section 7532, Revised Codes 1921. When the contract is read in the light of this statutory direction, I cannot see any ambiguity in it. Paragraph 10 is not in conflict with paragraph 3, so much stressed by the majority, but is merely supplementary to it. The language of paragraph 3 respecting production applies only to leases obtained from the government after production is secured.

Much of the mischief which crept into this case was caused by the contentions of counsel, precipitated in the first instance by the allegations of plaintiffs' complaint as to whether paragraph 10 is a covenant for future production or a covenant for exploration, and this unnecessary contention is seized upon by the majority as the determining factor in the case.

I think it does not make any difference, as an abstract proposition, whether we say it contemplated exploration, or production after exploration. From a practical standpoint it contemplated both. The lands were "wildcat"; no one knew whether they contained oil or gas. The key word of the section is production, but it was necessary to find oil before it could be produced. The drilling of wells in the circumstances necessarily was, in the first instance, of an exploratory character; and, if oil were found in paying quantities, further production was contemplated—"the lands embraced *within the terms* of this agreement shall be drilled into production as rapidly as possible." Reasonable diligence is required "in the drilling of oil wells on such premises, to such number and extent as said premises will admit of."

I am unable to see any ambiguity in paragraph 10. Its meaning is plain, and, as will be demonstrated presently, when His Honor, the trial judge, came to instruct the jury, it was plain to him.

Is there any suggestion in this entire contract that any of its language can be said to require the defendants to demonstrate "the existence or nonexistence of oil and gas in, under and upon said lands and the whole thereof?" Indubitably there is not. Yet, without alleging that there was any mistake or imperfection in the contract, or that it was in any way tainted with fraud or misrepresentation, plaintiffs alleged in the complaint that "before the agreement was reduced to writing it was orally understood and agreed between the parties thereto that all of the lands embraced in the aforesaid prospecting permits would be fully explored, tested and drilled for the purpose of demonstrating the existence or nonexistence of oil and gas in, under and upon the said lands and the whole thereof, and that wells upon said lands would be drilled as rapidly as possible in the exercise of reasonable diligence and to the number and extent as said lands would admit of," and that, after the agreement was reduced to writing and prior to the signing thereof by plaintiffs and the defendant corporation, "it was there orally agreed and understood between the plain-

tiffs and said defendant and was expressly stated and recited by the said defendant to the plaintiffs, that said Homestake Exploration Corporation understood and interpreted such paragraphs to mean and to bind the corporation to drill, as rapidly as possible, with reasonable diligence, a sufficient number of exploratory oil and gas wells upon all of the above described lands, in a number and to a depth sufficient to fully explore, test and demonstrate the existence or nonexistence of oil and gas in said land, to a depth of not less than 2,000 feet, in each well, unless oil and gas, or either of them, should be discovered in paying quantities at a lesser depth, * * * for the purpose of reasonably demonstrating the existence or nonexistence of oil and gas, or either of them, upon said lands. * * * ''

The defendants seasonably moved to strike out these and similar allegations, but the motion was overruled. This was error. Section 7520 of the Revised Codes of 1921 provides that ''the execution of a contract in writing, whether the law requires it to be written or not, supersedes all the oral negotiations or stipulations concerning its matter which preceded or accompanied the execution of the instrument.'' And section 10517 provides: ''When the terms of an agreement have been reduced to writing by the parties, it is to be considered as containing all those terms, and therefore there can be between the parties and their representatives, or successors in interest, no evidence of the terms of the agreement other than the contents of the writing, except in the following cases: 1. Where a mistake or imperfection of the writing is put in issue by the pleadings. 2. Where the validity of the agreement is the fact in dispute. But this section does not exclude other evidence of the circumstances under which the agreement was made, or to which it relates, as defined in section 10521, or to explain an extrinsic ambiguity, or to establish illegality or fraud. * * * ''

''The rule which prohibits the reception of evidence of oral promises or agreements made prior to or contemporaneously with the execution of a written contract purporting to embrace all its terms, which contradict, change, add to, or sub-

tract from the express terms, is declared and interpreted by the decisions of this court, as well as prescribed by statute. (*Knox* v. *Gerhauser*, 3 Mont. 278; *Fisher* v. *Briscoe*, 10 Mont. 124, 25 Pac. 30; *Anderson* v. *Perkins*, 10 Mont. 154, 25 Pac. 92; *Gaffney Mercantile Co.* v. *Hopkins*, 21 Mont. 13, 52 Pac. 561; *Sanford* v. *Gates, Townsend & Co.*, 21 Mont. 277, 289, 53 Pac. 749; *Armington* v. *Stelle*, [27 Mont. 13], 69 Pac. 115 [94 Am. St. Rep. 811].) This rule is applicable to oral negotiations and agreements which vary the legal construction and import of a written contract, although they do not contradict its express terms. (*Cliver* v. *Heil*, 95 Wis. 364, 70 N. W. 346, and cases there cited; 27 Am. & Eng. Enc. Law, 1st ed., p. 862).'' (*Riddell* v. *Peck-Williamson H. & V. Co.*, 27 Mont. 44, 69 Pac. 241, 242.)

The terms of a contract are not to be deemed ambiguous merely because a party to it claims he does not understand them, or that they do not mean to him what he thought they did when he signed the contract, or that he and the other party to it agreed that it should mean something other than that which its language imports.

The interpretation pleaded by plaintiffs undoubtedly is an attempt to add to the terms of the contract. This is in effect but an averment that the parties understood and intended the contract should mean something different from that which is therein expressed.

''Upon well-established principles, parties themselves may not so alter the terms of a written contract. (*Brintnall* v. *Briggs*, 87 Iowa, 538, 54 N. W. 531. See, also, *Fisher* v. *Briscoe*, 10 Mont. 124, 25 Pac. 30, and *Anderson* v. *Perkins*, 10 Mont. 154, 25 Pac. 92.) Nor will the courts do for them that which they could not themselves accomplish. From the allegations of the complaint it is manifest that the plaintiff does not contend for the reformation of the written contract on the ground of fraud, accident or mistake, but seeks to reform such contract, complete upon its face, and the terms of which were understood and assented to by the plaintiff at the time it was made, upon the ground that the parties understood and in-

tended to interpret it in a sense contrary to that expressed by its language. This may not be done. (*Brintnall* v. *Briggs,* and section 3132, supra.)'' (*Gaffney Mercantile Co.* v. *Hopkins,* 21 Mont. 13, 52 Pac. 561, 562.)

''The written contract superseded all prior negotiations and agreements, and to it alone must we look to determine the obligation of the defendant. (*Kelly* v. *Ellis,* 39 Mont. 597, 104 Pac. 873; *Rowe* v. *Emerson-Grantingham Co.,* 61 Mont. 73, 201 Pac. 316; *State ex rel. Broadwater Farms Co.* v. *Broadwater Elevator Co.,* 61 Mont. 215, 201 Pac. 687; *Cook* v. *Northern Pac. Ry. Co.,* 61 Mont. 573, 203 Pac. 512; *Leigland* v. *Rundle Land & Abstract Co.,* 64 Mont. 154, 208 Pac. 1075; *Webber* v. *Killorn,* 66 Mont. 130, 212 Pac. 852].)'' (*Burnett* v. *Burnett,* 68 Mont. 546, 219 Pac. 831, 832.)

*McDaniel* v. *Hager-Stephenson Oil Co.,* 75 Mont. 356, 243 Pac. 582, 584, is directly in point, and sustains my views: ''A contract may not be changed or revised under the guise of interpretation. Where a contract is plain and clear in its terms neither interpretation nor construction is permissible. (*Ming* v. *Pratt,* 22 Mont. 262, 56 Pac. 279; *Spaulding* v. *Maillet,* 57 Mont. 318, 188 Pac. 377.) When the language employed by the parties 'is free from ambiguity or uncertainty, it is beyond the power of the court to enlarge or restrict its application or meaning.' (*Union Bank & Trust Co.* v. *Himmelbauer,* 56 Mont. 82, 181 Pac. 332.) And when the terms of a contract are plain and unambiguous, resort may not be had to extrinsic circumstances under the pretense of ascertaining its meaning. (*Purdin* v. *Westwood R. & L. Co.,* 67 Mont. 553, 216 Pac. 326; *Berne* v. *Stevens,* 67 Mont. 254, 215 Pac. 803.) If through fraud or mistake the writing did not truly express the intention of the parties, it might, upon the application of the one aggrieved have been revised to express that intention (sec. 8726, R. C. 1921), but no such application was made.''

''Resort may be had to extrinsic evidence in aid of interpretation only when the contract appears on its face to be am-

biguous or uncertain.'' (*Hill Cattle Corp.* v. *Killorn,* 79 Mont. 327, 256 Pac. 497, 502.)

*Sutton* v. *Masterson,* 86 Mont. 530, 284 Pac. 264, 266, is relied upon by the majority. It has little, if any, application. Therein we said: "Clearly the so-called 'buyers order' is not free from ambiguity; that it does not contain all the terms of the agreement is obvious, and, even from the language used, the intention of the parties is not clear. Indeed, it is apparent that the writing is nothing more than a brief memorandum of certain points of the agreement; it is uncertain and ambiguous, and the court ruled correctly in admitting the evidence complained of.''

In *Musselshell Valley F. & L. Co.* v. *Cooley,* 86 Mont. 276, 283 Pac. 213, testimony had been admitted concerning the intention of the grantor in a deed; it was pointed out that the challenged testimony did not tend to vary the terms of the instrument in any degree.

In view of our own statutes and decisions which are clear and fully adequate, I see no reason to resort to the decisions of other courts on the subject.

The matter challenged by defendants' motion was sham and irrelevant, and the motion should have been sustained. This is good practice. (*State* v. *American Surety Co.,* 78 Mont. 504, 255 Pac. 1063; *McCormick* v. *Shields,* 63 Mont. 9, 205 Pac. 831.)

Thereafter, as they were required to do, defendants filed their answer, in the course of which they denied *inter alia* the matter which they had unsuccessfully moved to strike from the complaint.

At the beginning of the trial, over the objections of the defendants, among others that the written contract "is the entire contract relating to the subject-matter of the complaint, and that such allegations purporting to state an oral understanding or an oral interpretation of said contract are immaterial, irrelevant and incompetent,'' the plaintiffs proceeded to introduce testimony to support the allegations of their complaint. It will not be useful to set forth here the testimony

even in brief—time and space will not permit—which the plaintiffs offered and the court admitted in support of the pleaded conversations and oral understandings of the parties prior to the signing of the contract; it is enough to say that the testimony would not have been admitted if the case had been tried upon the written contract in the absence of the prior oral statements; and, if the statutes which I have quoted mean what they plainly say, this testimony was inadmissible and highly prejudicial to defendants. Two illustrations will suffice to verify this statement. One of the plaintiffs over the objection of the defendants was permitted to testify that, while prior negotiations were being carried on between the plaintiffs and the Homestake Exploration Corporation, Mr. Peters, the president of the corporation, said ''they would make a sieve out of the lands.'' The witness continued: ''We took the expression literally, and understood from such remark that he would make that territory look like a sieve, and that was our conception of what his obligation and these corporations' obligation under the contract was.''

A witness for plaintiffs, a drilling contractor, having qualified as an expert, was permitted over objection to answer the question as to what number of wells to the forty would be a reasonably fair test to determine the existence of oil or gas in paying quantities. He answered, ''Four wells to the forty.'' Much other testimony along this line was permitted over defendants' objections.

And yet, after all this testimony was before the jury, the court instructed the jury without striking any of the testimony from the record, and without directing the jury to disregard any of it, that ''the contract provides that the Homestake Exploration Company 'hereby binds itself to the exercise of reasonable diligence in the drilling of oil wells on said premises to such number and extent as said premises will admit of.' By this is meant that the Homestake Exploration Corporation obligated itself to drill the number of wells upon the property which the reasonably prudent operator would have drilled under all the facts and circumstances in this case,

exercising reasonable diligence. If a reasonably prudent oil and gas operator, under all the circumstances, would not have drilled more exploratory wells on the permit acreage in question, then the application of the contract in that particular has been fulfilled. * * * If a reasonably prudent oil and gas operator, under all the circumstances, would have drilled more exploratory wells on the permit acreage in question, then the obligation of the contract in that particular has not been fulfilled.''

This advice to the jury was based upon paragraph 10 as it was written. It was given without any reference to the oral testimony which had been admitted. If the instruction was correct—and it was—it demonstrates the error committed in admitting oral testimony respecting the meaning of the paragraph.

I shall quote two more. In instruction 12 the court said: ''By this contract the defendants were and are bound to the exercise of reasonable diligence in the drilling of oil wells on the premises described in the complaint to such number and extent as said premises will admit of. The defendants were not bound to drill additional wells on the permit acreage merely to demonstrate the existence or nonexistence of oil or gas, nor to drill any additional wells where there was no reasonable expectation of securing oil or gas in paying quantities.'' Instruction 16: ''The contract does not, by specific terms, require the drilling upon the Frank E. Flaherty permit, or the John Andersch permit of any particular number of wells beyond the limited requirements of the governmental permits. The contract does require the exercise of reasonable diligence upon the part of the operator in the drilling of oil wells upon the lands therein described. In determining the question of whether or not other wells should have been drilled you must give consideration to all of the facts regarded collectively. Some of these are: the result of oil operations and exploration work on adjacent premises, the extent of the subterranean oil reservoir; also its character and contour; market conditions; the prospects for further production; and the knowledge possessed by those expert in locating oil bodies.

350

This contract was intended for the benefit of both parties, and the defendants had the right to regard their own interests as well as those of the plaintiffs. In short, the diligence required of the defendants involved such a course of conduct upon their parts as operators of ordinary prudence would pursue, having in mind the securing of the financial benefits sought by both parties to this contract."

These two instructions illustrate still more forcibly the error which was ever present during the presentation of plaintiffs' case, and which prevented defendants from having a fair trial.

I think the case should go back for a new trial with directions as to the rule which should be given the jury to guide it in fixing damages. It does not seem to me that the "well-cost" rule is the one which should be given in a case like this. I have no quarrel with the *Ardizonne Case* (*Ardizonne* v. *Archer*, 72 Okl. 70, 178 Pac. 263), for there the defendants were expressly obligated to drill a specific well to a certain depth. It does not seem reasonable to me that "well-cost" measure of damages can be allowed where the wells to be drilled are not definitely specified in the contract. How can that rule be applicable here, when the contract provides that the plaintiffs are to receive only a royalty after the expense of drilling the well has been first paid, and this without proving, or even attempting to prove, that any oil would have been encountered? If, as a matter of fact, oil would not have been found in the Andersch and Flaherty lands, and from the explorations of others upon adjacent territory that might be the result, how could drilling have benefited the plaintiffs? If that be the case, then, if this verdict is sustained, the plaintiffs will receive $80,000, where, if any number of dry wells had been drilled, they would not have received a cent. Upon the proof it is not shown that plaintiffs have lost anything. This verdict is based upon speculation alone, and that is not an allowable basis for a verdict under our statutes. (Secs. 8667, 8668, Rev. Codes 1921.)

MR. JUSTICE ANGSTMAN, dissenting: In the view I take of this case, reversible error was committed in adopting the "well-

cost'' rule as the measure of damages. If we take the contract as amplified by the preliminary oral negotiations, we still have a contract which does not specify the number of wells that defendants should drill. Their obligation under the contract, as amplified by the oral evidence, was simply to do such drilling as a reasonably prudent oil and gas operator under all the circumstances would have drilled in the exercise of reasonable diligence. The court so instructed the jury. The jury was also instructed that ''the defendants were not bound to drill additional wells on the permit acreage merely to demonstrate the existence or nonexistence of oil or gas, nor to drill any additional wells where there was no reasonable expectation of securing oil or gas in paying quantities.''

The court also instructed the jury that: ''In determining the question of whether or not other wells should have been drilled, you must give consideration to all of the facts regarded collectively. Some of these are: the result of oil operations and exploration work on adjacent premises; the extent of the subterranean reservoir; also its character and contour; market conditions; the prospects for further production; and the knowledge possessed by those expert in locating oil bodies. This contract was intended for the benefit of both parties, and the defendants had the right to regard their own interests as well as those of the plaintiffs. In short, the diligence required of the defendants involved such a course of conduct upon their parts as operators of ordinary prudence would pursue, having in mind the securing of the financial benefits sought by both parties to this contract.''

In the cases cited in the majority opinion as sustaining the well-cost rule as the proper measure of damages, there was breach of an express contract for the drilling of a specified number of wells. The drilling company in each of those cases could read its contract and determine therefrom the exact extent of the drilling to be done. It could easily determine when it had breached its contract. Even in those cases I fail to see justification for adopting the well-cost as the measure of damages. But, however that may be, under the contract here

defendants, apparently in good faith, believed they had complied fully with the contract. They believed further drilling would be unprofitable. Their conclusion in that respect would, of course, not be final. The rule is that neither party to an oil and gas lease is the arbiter of what is reasonable diligence, but both are bound by the standard of what, in the circumstances, would be reasonably expected of an operator of ordinary prudence having due regard for the interests of both. (*Texas Co.* v. *Ramsower,* (Tex. Com. App.) 7 S. W. (2d) 872; *Fox Petroleum Co.* v. *Booker,* 123 Okl. 276, 253 Pac. 33; *Broswood Oil & Gas Co.* v. *Mary Oil & Gas Co.,* 164 Okl. 200, 23 Pac. (2d) 387.)

Until this verdict was returned, defendants had no way of knowing definitely that they were obliged to do further drilling under the contract. It then becomes necessary to determine what the measure of damages is in such a case. In the case of failure to operate a well or to drill offset wells, the authorities generally hold that the measure of damages is the value of the oil that would have been produced to plaintiffs in the way of royalties, had the drilling been done. (*Junction Oil & Gas Co.* v. *Pratt,* 99 Okl. 14, 225 Pac. 717; Morrison & De Soto on Oil and Gas Rights, pp. 209, 210; *Howerton* v. *Kansas Natural Gas Co.,* 82 Kan. 367, 108 Pac. 813, 34 L. R. A. (n. s.) 46; *Gwynn* v. *Wisdom,* (Tex. Com. App.) 14 S. W. (2d) 265; *Blair* v. *Clear Creek Oil & Gas Co.,* 148 Ark. 301, 230 S. W. 286, 19 A. L. R. 430; Summers on Oil and Gas, sec. 1397.) The fact that the matter is difficult of definite proof does not alter the rule. (*Texas Co.* v. *Ramsower,* supra, rehearing denied (Tex. Com. App.) 10 S. W. (2d) 537; Summers on Oil and Gas, supra.)

The same rule has been extended to cases where there has been a breach of the covenant fully to develop land for oil and gas. (*Texas Pacific Coal & Oil Co.* v. *Barker,* 117 Tex. 418, 6 S. W. (2d) 1031, 1039, 60 A. L. R. 936.)

Some courts deny the right to recover the well-cost under any circumstances. Thus the well-cost rule was disapproved in the case of *Guardian Trust Co.* v. *Brothers,* (Tex. Civ. App.) 59 S. W. (2d) 343, 345, where the court said: "Sup-

pose these appellants had been the owners of a vacant lot in the town of Desdemona, near which the land covered by this lease is situated, and had entered into a contract with appellee, under the terms of which appellee agreed to erect a building thereon according to certain specifications and to pay appellants one-eighth of the gross revenues to be derived from renting the building, and that the contract had provided that appellee should have the right to remove the building at the expiration of the lease, placing the land in as good condition as it was before the lease was given. Then suppose that appellee had failed to erect the building. Would it be seriously contended that appellant's measure of damages for the breach of that contract would be what it would have cost to erect the building? We think not. The loss or injury actually sustained by the obligee, rather than the cost of performance by the obligor, is the proper measure of damages for the breach of a contract. When that well-established rule is departed from, compensatory damages become either punitive damages, because too much, or inadequate damages, because too little, and the fundamental purpose of compensatory damages is lost sight of. We can see no just reason for departing from the well-established rule of law for measuring damages simply because the contract relates to the sinking of an oil well. The fact that the nature of the contract is such as to render it impossible to ascertain with mathematical accuracy the exact amount of the damages suffered by the lessor should not operate to change the rule. The parties knew that difficulty inhered in the subject about which they were contracting, but chose not to stipulate for liquidated damages.''

It seems to me that where, as here, there is no loss to plaintiffs because of failure to drill offset wells, but only their right to be compensated for defendants' failure to drill exploratory wells, to the extent that a reasonably prudent operator would have done, and where the contemplated drilling was for the mutual benefit of the parties, the well-cost rule is not the proper measure of damages. Under the contract here, if the defendants did further drilling and discovered oil or gas, plain-

tiffs would not be entitled to any of it until defendants were first repaid out of production for the expense of the drilling.

I think, if plaintiffs are able to prove with the requisite degree of certainty the value to them of requisite additional drilling in the way of royalty that would come to them, that should be the rule of damages. While there is authority to the contrary (*Breeden* v. *Hopkins*, 210 App. Div. 412, 206 N. Y. Supp. 282; *Texas Pacific Coal & Oil Co.* v. *Barker*, supra), I think, at most, if plaintiffs cannot prove their damages with sufficient certainty, that then their remedy under the facts here is to compel defendants specifically to perform the contract, or, in the alternative, pay to plaintiffs the cost of the wells which should be drilled. There is a recognized field of equity jurisprudence for specific performance of a contract when for some reason an action for damages cannot be maintained. This, I think, is such a case, if plaintiffs cannot prove with a reasonable degree of certainty the value of the oil or gas which would have come to them, had the drilling been done. (Compare *Alley* v. *Peeso*, 88 Mont. 1, 290 Pac. 238.)

I see no reason why, if plaintiffs cannot prove the loss of the value of the oil and gas resulting to them, with reasonable certainty, a court of equity should not define the rights of the parties, determine what wells should be drilled and the time in which they should be drilled—the contract not yet having expired—and give defendants an opportunity to comply with its order, or, in the alternative, to pay plaintiffs the cost thereof. A somewhat similar decree was entered in the cases of *Austin* v. *Ohio Fuel Oil Co.*, 218 Ky. 310, 291 S. W. 386, *Webb* v. *Croft*, 120 Kan. 654, 244 Pac. 1033, and *Alford* v. *Dennis*, 102 Kan. 403, 170 Pac. 1005, where the question arose as to whether leases should be forfeited for noncompliance with drilling covenants.

The case of *Texas Pacific Coal & Oil Co.* v. *Barker,* supra, recognizes the right of defendants to receive the benefits which would have come to them, had the required drilling been done. In that case the court said: "We do not mean to say that a lessee, desiring and offering to go on and comply with his

obligations, might not be able to invoke the aid of a court of equity in such a way as to obtain the benefit of unmined minerals on which such lessee had been required to pay royalties. Since the effect of judgment in favor of the lessor for the value of royalties is to award specific performance of the lessee's obligation, the lessee might be able to present a state of facts under which a court of equity would be warranted in decreeing to the lessee like specific performance by the lessor, including delivery of the minerals on which the royalty had been paid." In other words, if defendants are required to do the drilling found by the jury to be necessary for compliance with the contract, or bear the expense thereof, justice between the parties requires that defendants be afforded the opportunity to recoup their expenses from oil production before plaintiffs are entitled to a money judgment for compensatory damages.

The adoption of the well-cost rule affords no such opportunity unless the decree is made in the alternative. The rule adopted here is oppressive and seems to me to award punitive, not compensatory, damages. I think it was error to adopt the well-cost as the measure of damages under the facts here. But, if the well-cost is the proper measure of damages, the court should, I think, enter an alternative decree awarding such damages to plaintiffs only in the event that defendants fail to drill the number of wells specified in the decree, within the time therein to be specified.

No useful purpose would be subserved in here discussing the question whether the contract is ambiguous so as to admit of oral evidence to explain the ambiguity.

I think the cause should be remanded for a new trial.

Rehearing denied January 4, 1935.

MR. CHIEF JUSTICE CALLAWAY and MR. JUSTICE ANGSTMAN dissenting.